**LEWIS BRISBOIS BISGAARD & SMITH LLP**
KATHLEEN M. WALKER, SB# 156128
JEFFREY S. HEALEY, SB# 217069
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for Defendant, TODD
LANMAN, M.D.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY KLAYMAN,<br><br>Plaintiff,<br><br>vs.<br><br>TODD LANMAN, M.D.,<br><br>Defendant. | CASE NO. 2:26-CV-04525-AB-PD<br><br>*District Judge: Hon. Andre Birotte Jr.*<br>*Magistrate:  Hon. Patricia Donahue*<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF JEFFREY S. HEALEY, ESQ.; DECLARATION OF BLAIR SIEGEL; EXHIBITS**<br><br>[Filed concurrently with Proposed Order]<br><br>Action Filed: April 28, 2026 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORDS:

PLEASE TAKE NOTICE that on June 26, 2026 at 10:00 a.m., or as soon thereafter as the matter can be heard, before the Honorable Andre Birotte Jr., in Courtroom 7B, located at 350 West 1st Street, 7th Floor, Los Angeles, California, 90012, Defendant TODD LANMAN, M.D.  ("Defendant"), hereby Motions for an

177182245.1

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

order compelling plaintiff to arbitrate in binding arbitration the controversy alleged in the Complaint and request for stay of this action to be heard.

The Motion and request for stay is based upon this Notice, the accompanying Motion to Compel Arbitration pursuant to the Federal Arbitration Act and/or California Code of Civil Procedure §§ 1281, 1281.2, 1281.4, and 1290 et. seq., the Memorandum of Points and Authorities in support, the attached declaration of Jeffrey S. Healey, Esq, and the Declaration of Blair Siegel, the attached exhibits, all pleadings, papers and records on file herein, and upon any oral argument of counsel at the time of the hearing of this Motion.

This motion is made following the conference of counsel pursuant to L.R.7-3, which Defendant commenced relative to Plaintiffs' Complaint in writing on May 19, 2026, followed by additional writing on May 21 and a telephonic conference with plaintiff on May 22, 2026.   (See Declaration of Jeffrey S. Healey, Esq., filed herewith).

DATED:  May  26, 2026          KATHLEEN M. WALKER
                               JEFFREY S. HEALEY
                               LEWIS BRISBOIS BISGAARD & SMITH LLP


                               By:    /s/
                                   _____
                                   JEFFREY S. HEALEY, ESQ.
                                   Attorneys for Defendant, TODD
                                   LANMAN



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

177182245.1

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE
DISTRICT COURT MATTER

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................... 1

II.  FACTUAL BACKGROUND ......................................................................................... 2

III. GOVERNING LAW AND CALIFORNIA PUBLIC POLICY COMPEL ARBITRATION OF THIS MATTER ............................................................................ 8

    A.   Legal Standard ................................................................................................... 8

    B.   Plaintiff Himself Executed Both Arbitration Agreement ................................... 9

    C.   The Claims Asserted In Plaintiff's Complaint Are Explicitly Covered By The  Arbitration Agreements ............................................................................ 10

    D.   The Arbitration Agreement cannot be attacked as being a contract of adhesion or unconscionable ............................................................................ 11

IV.  THE DISTRICT COURT MATTER SHOULD BE STAYED PENDING THE HEARING ON THIS MOTION AND SHOULD REMAIN STAYED PENDING THE COMPLETION OF ARBITRATION ....................................................................... 13

V.   CONCLUSION ............................................................................................................. 14



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

177182245.1

i

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Alexander v. FBI*,
186 F.R.D. 188 (D.D.C. 1999) ................................................................................................. 4

*Baldwin Hardware Corp.v. FrankSu Enter. Corp.*,
78 F.3d 550 (Fed. Cir. 1996) ......................................................................................... 3, 4, 5

*Bridge Fund Capital Corp. v. Fastbucks Franchise*,
622 F.3d 996 (9th Cir. 2010) .................................................................................................. 9

*In re Bundy*,
840 F.3d 1034 (9th Cir. 2016) ........................................................................................... 2, 16

*Dean Witter Reynolds Inc. v. Byrd*,
470 U.S. 213 (1985) ............................................................................................................... 8

*Dely v. Far E. Shipping Co.*,
238 F. Supp. 2d 1231 (W.D. Wash. 2003) .............................................................................. 4

*Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice*,
159 F. Supp. 2d 763 (D.D.C. 2001) ....................................................................................... 4

*Klayman v. Barmack*,
No. 08-1005 (JDB), 2009 WL 4722803 (D.D.C. Dec. 4, 2009) ............................................. 5

*Klayman v. City Pages*,
No. 5:13-cv-143-Oc22PRL, 2015 WL 1546173 (M.D. Fla. Apr. 3, 2015), aff'd,
650 F. App'x 744 (11th Cir. 2016)...................................................................................... 4, 5

*Klayman v. Judicial Watch, Inc.*,
802 F. Supp. 2d 137 (D.D.C. 2011) ....................................................................................... 5

*MacDraw, Inc. v. CIT Grp. Equip.Fin., Inc.*,
994 F. Supp. 447 (S.D.N.Y. 1997), aff'd, 138 F.3d 33 (2d Cir. 1998) ............................... 3, 4

*Material Supply Int'l, Inc. v. Sunmatch Indus., Co.*,
No. Civ. A. 94 1184, 1997 WL 243223 (D.D.C. May 7, 1997), aff'd in part and
reversed in part, 146 F.3d 983 (D.C. Cir. 1998) .................................................................... 3

*Montgomery v. Risen*,
No. 15-cv 02035-AJB-JLB, 2015 WL 12672703 (S.D. Cal. Oct. 2, 2015) ............................ 5

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
460 U.S. 1 (1983) ............................................................................................................... 2, 9



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

177182245.1

ii

*Perry v. Thomas*,
   482 U.S. 483 (1987) ...................................................................................................1, 8

*Wire Rope Importers' Ass'n v. United States*,
   18 C.I.T. 478 (Ct. Int'l Trade 1994)........................................................................3

**State Cases**

*24 Hour Fitness, Inc. v. Superior Court*
   *(*1998) 66 Cal.App.4th 1199.....................................................................................12

*Armendariz v. Foundation Health Psychare Services, Inc.*
   (2000) 24 Cal.4th 83...............................................................................................12

*Berman v. Dean Witter & Co., Inc.*,
   44 Cal. App. 3d 999 (1975).................................................................................2, 8

*Bolanos v. Khalatian*,
   231 Cal.App.3d 1586 (1991)..................................................................................11

*Brookwood v. Bank of America*
   (1996) 45 Cal.App.4th 1667...................................................................................12

*Engalla v. Permanente Med. Group, Inc.*,
   15 Cal. 4th 951 (1997)..............................................................................................9

*In Retail Clerks Union, Local 775 v. Purity Stores, Inc.*,
   41 Cal. App. 3d 225 (1974).......................................................................................9

*Mission Viejo Emergency Medical Associates v. Beta Healthcare Group*
   (2011) 197 Cal.App.4th 1146.................................................................................13

*Pacific Investment Co. v. Townsend*,
   58 Cal. App. 3d 1 (1976).......................................................................................2, 9

*Ramirez v. Superior Court*
   103 Cal.App.3d 746 .................................................................................................12

*Randas v. YMCA*,
   17 Cal. App. 4th 158 (1993).....................................................................................11

*Rosenthal v. Great Western Fin. Sec. Corp.*,
   14 Cal. 4th 394 (1996)..........................................................................................9, 12

*Stern v. Burkle*,
   867 N.Y.S.2d 20 (Sup. Ct. 2008) ...........................................................................3

*Weeks v. Crow*,
   113 Cal. App. 3d 350 (1980)....................................................................................9

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

177182245.1

iii

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

**Statutes**

Cal. Code Civ. Proc. § 1281 ................................................................................................8

Cal. Code Civ. Proc. 1295 .................................................................................................11

**Court Rules**

Federal Rules of Evidence 201 ...........................................................................................5

L.R I .................................................................................................................................22

LR 7 .................................................................................................................................15

177182245.1

iv

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE
DISTRICT COURT MATTER

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

This action brought by plaintiff, Larry Klayman, stems from the care and treatment provided to him by Defendant neurosurgeon Todd Lanma, M.D.  The Complaint asserts various causes of action stemming from his consultations with Dr. Lanman and the surgery he underwent with Dr. Lanman.  (See Complaint) Defendant maintains that the instant action is improper as plaintiff executed a release of liability of all claims via Docusign on 10/15/25 in exchange for $11,250. (See Exhibit "C" to the Declaration of Blair Siegel which consists of the release of liability letter and the Docusign Certificate of completion with regard to Mr. Klayman's execution of same).  Further, by bringing this action in the District Court plaintiff is ignoring his contractual obligation to arbitrate any and all disputes arising out of or related to the care and treatment provided to him by Dr. Lanman pursuant to the arbitration agreements he executed.

Plaintiff himself executed two separate arbitration agreements that call for any dispute arising out of the care and treatment provided to him by Dr. Lanman to be adjudicated in binding arbitration.  (See Exhibit "A" and "B" to the declaration of Blair Siegle.)  The first arbitration agreement was executed by plaintiff via Docusign on 6/25/24 and the second was executed live in person on 6/26/24.  It should be noted that plaintiff, Larry Klayman, is an attorney as thus is well versed and trained in the law and thus cannot credibly claim that he did not understand what he was executing. As such, the instant Motion to compel this matter into binding arbitration should be granted.  Once the proper venue is determined a Motion to Dismiss based on the aforementioned release of liability signed by plaintiff will be filed.

Governing law mandates that arbitration agreements, such as those entered by Plaintiff, are presumed enforceable and rigorously enforced. *See Perry v.*

177182245.1

1

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*Thomas*, 482 U.S. 483, 490 (1987); *Berman v. Dean Witter & Co., Inc.*, 44 Cal. App. 3d 999, 1003 (1975). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983); *see also Pacific Investment Co. v. Townsend*, 58 Cal. App. 3d 1, 9-10 (1976).

Per the terms of the attached Arbitration Agreements, Plaintiff is contractually bound to adjudicate this matter in binding arbitration and not in District Court. Plaintiff cannot and must not be permitted to avoid his contractual obligation and thus the instant Motion to Compel Arbitration should be granted. Failure to grant the instant Motion will allow plaintiff to use the judicial system to breach an otherwise valid and enforceable contract to arbitrate. Failure to grant the instant Motion will also deviate from the clear intent of the parties that disputes, such the instant dispute, be resolved by way of binding arbitration. Further, failure to compel arbitration would open the door to undermine all arbitration agreements after one party has relied upon its existence. Defendant is entitled to arbitration based on the strong public policy favoring arbitration as a means of resolving disputes because it is expeditious, inexpensive, and relieves overburdened courts. Accordingly, Defendant hereby respectfully requests that the instant Motion be granted.

## II.    FACTUAL BACKGROUND

Plaintiff Larry Klayman is an attorney and has a colorful litigation history which encompasses license suspensions and reprimands for improper and unethical behavior.  (See *In re Bundy*, 840 F.3d 1034, 1046 (9th Cir. 2016)) attached to the Declaration of Jeffrey Healey hereto as Exhibit "C")) which highlights the following:

177182245.1

2

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

"Klayman failed to mention, but the district court found quite relevant, "numerous other courts' findings that he is unfit to practice" based on his "inappropriate and unethical behavior." The district court supplied us with a 2007 order of the Supreme Court of New York, which denied Klayman' petition to proceed pro hac vice because "Klayman's record demonstrates more than an occasional lapse of judgment, it evinces a total disregard for the judicial process." Order Denying Pro Hac Vice Application at 4, *Stern v. Burkle*, 867 N.Y.S.2d 20 (Sup. Ct. 2008). The New York court collected examples from other courts, and the district court referred to these instances of Klayman's sanctioned, sanctionable, or questionable behavior:

• The Federal Circuit affirmed the district court's revocation of Klayman's ability to appear before the district court pro hac vice in perpetuity and its sanctioning of Klayman for accusing the trial judge of anti-Asian bias and "unreasonably and vexatiously multiplying the proceedings." *Baldwin Hardware Corp.v. FrankSu Enter. Corp.*, 78 F.3d 550, 555 (Fed. Cir. 1996).

• The Second Circuit affirmed the district court's revocation of Klayman's ability to appear before the district court pro hac vice in perpetuity and its sanctioning of Klayman for "undignified and discourteous conduct that was degrading to the [district court] and prejudicial to the administration of justice" by, among other things, making accusations of racial and political bias and acting "abusive[ly] and obnoxious[ly]." *MacDraw, Inc. v. CIT Grp. Equip.Fin., Inc.,* 994 F. Supp. 447, 455 (S.D.N.Y. 1997), aff'd, 138 F.3d 33 (2d Cir. 1998).

• Klayman was sanctioned for filing an untimely complaint and opposing the government's motion with "frivolous filings" that "wasted time and resources of defendants as well as of the court." *Wire Rope Importers' Ass'n v. United States*, 18 C.I.T. 478, 485 (Ct. Int'l Trade 1994).

• Klayman exhibited "often highly inappropriate behavior" and his performance "was episodically blighted by rude and unprofessional behavior which was directed toward the presiding judge and opposing counsel." *Material Supply Int'l, Inc. v. Sunmatch Indus., Co.*, No. Civ. A. 94 1184, 1997 WL 243223 at *8, *10 n.7 (D.D.C. May 7, 1997), aff'd in part and reversed in part, 146 F.3d 983 (D.C. Cir. 1998).



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

177182245.1

3

• Klayman "apparently misread (or never read) the local rules" and the district court threatened sanctions for any future failures to        comply with local rules.  *Alexander v.FBI*, 186 F.R.D. 197, 199 (D.D.C. 1999). The district court "gr[ew] weary of [Klayman's] use—and abuse—of the discovery process" and "ha[d] already sanctioned [Klayman] for making misrepresentations to the court, allowing the court to rely upon those representations in a favorable ruling, and then later contravening those very (mis)representations." *Alexander v. FBI*, 186 F.R.D. 188, 190 (D.D.C. 1999).

• Klayman responded to the district court's orders with a "forked tongue" and made arguments with "malicious glee."  *Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice*, 159 F. Supp. 2d 763, 764 (D.D.C. 2001).

• Klayman made arguments regarding the conduct of the district court that were "bizarre" and "beyond the far fetched."  *Dely v. Far E. Shipping Co.*, 238 F. Supp. 2d 1231, 1241 (W.D. Wash. 2003)."

\*\*\*

"Of these eight instances of revocations or denial of pro hac vice status, sanctions for ignoring local and federal rules, and complaints of misrepresentations and omissions, Klayman mentioned only two to the district court.  And in doing so, the district court noted, Klayman still failed to accept any responsibility for his actions.  Instead, he claimed that the judges were being "vindictive" in their orders forever barring him from appearing pro hac vice in their courtrooms. He failed, however, to mention that these two "vindictive" district court judges' orders were affirmed by their respective federal appellate courts, both of which commented on Klayman's inappropriate behavior.  See *MacDraw*, 138 F.3d at 37–38; *Baldwin Hardware*, 78 F.3d at 555. The district court went on to highlight specifically a more recent case, which Klayman failed to mention, in which the district court's summary judgment order noted how Klayman "has routinely shown a disregard for [the district court's] Local Rules."  *Klayman v. City Pages*, No. 5:13-cv-143-Oc22PRL, 2015 WL 1546173, at \*8 n.7 (M.D. Fla. Apr. 3, 2015), aff'd, 650 F. App'x 744 (11th Cir. 2016). The Florida district court had "become quite frustrated with [Klayman's] various tactics to avoid Court rules throughout the course

177182245.1

4

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

of this litigation.  Unfortunately, the Court learned early on in this case that this approach to litigation is the norm and not the exception for [Klayman]."  Id."

"Moreover, a quick Westlaw search has found three additional cases, bringing the grand total to twelve, in which Klayman's ability to practice law in an ethical and orderly manner was called into question:

• Klayman's "fail[ure] to comply with even the most basic of discovery requirements" was "not simply an unexplained hiccup in an otherwise diligently prosecuted case" and thus warranted sanctions. *Klayman v. Barmack*, No. 08-1005 (JDB), 2009 WL 4722803, at *1(D.D.C. Dec. 4, 2009).

• After "the patent failure of the Court's use of lesser sanctions in the past to have any discernible effect on Klayman' conduct," Klayman's "consistent pattern of engaging in dilatory tactics, his disobedience of Court ordered deadlines, and his disregard for the Federal Rules of Civil Procedure and the Local Rules of this Court" necessitated further, more severe, sanctions.  *Klayman v. Judicial Watch, Inc.*, 802 F. Supp. 2d 137, 138–39 (D.D.C. 2011).

• Klayman repeatedly did not "attempt to comply" with local rules, and the district court threatened sanctions for any further violations. *Montgomery v. Risen*, No. 15-cv 02035-AJB-JLB, 2015 WL 12672703, at *1 (S.D. Cal. Oct. 2, 2015)."

*** 

"Finally, the district court expressed concern that Klaymanhas shown disregard for district judges in the past by confronting them personally…*MacDraw*, 138 F.3d at 38 n.3 (citing *Baldwin Hardware*, 78 F.3d at 555, 562)."  (Exhibit "C" to (Declaration of Jeffrey Healey attached hereto)

Defendant respectfully requests pursuant to Federal Rules of Evidence 201, that the Court take judicial notice of the above opinion attached to the Declaration of Jeffrey Healey as Exhibit "C".

The above Opinion demonstrates a concerning pattern of improper conduct and calls into question the credibility of plaintiff and any arguments he may make in opposition to this Motion and/or in opposition to a future Motion to Dismiss.

As discussed above, prior to filing the instant action, plaintiff and Defendant reached an informal resolution of "any claims or action related to my [Larry Klayman] treatment" with Dr. Lanman in exchange for a refund of the $11,250 Mr. Klayman had already paid Dr. Lanman.  The release was executed by Mr. Klayman on 10/15/25. (See Exhibit "C" to the declaration of Blair Seigel). The release letter he signed was sent to him via Docusign.  The Docusign Certificate of completion affirms it was sent to plaintiff's email address, (the same email address he used to communicate to Defendant from on multiple occasions), he signed the letter below the release language, and returned it to Defendant via Docusign.  Despite same, plaintiff now contends the letter he signed did not contain the above waiver language despite Docusign being a secure method of document transmission and the letter containing the Docusign envelope ID number at the top and his Docusign ID number below his signature on the release letter.  His contention is non-credible and unfortunately appears consistent with the above-mentioned inappropriate conduct.

Meet and confer efforts to secure a dismissal based on the aforementioned release were unsuccessful.  As were efforts to convince plaintiff to stipulate to adjudicate this matter in binding arbitration based on the two arbitration agreements he executed prior treating with Dr. Lanman.  As such, the instant Motion was necessary.  (Declaration of Jeffrey Healey).

The first Arbitration Agreement was sent to plaintiff via Docusign and was executed on 6/25/24 by plaintiff via Docusign.  (Exhibit "B" to the declaration of Blair Siegel).  The second arbitration agreement (same terms and the first agreement) was executed by plaintiff in person when he appeared in person to

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Defendant's office for his medical consultation. (See Declaration of Blair Seigel and Exhibit "A" attached thereto). Considering there are two arbitration agreements executed by plaintiff and considering that plaintiff is an attorney, plaintiff cannot credibly claim he was not aware that he had agreed to arbitrate any and all disputes arising out of the care and treatment provided to him by Dr. Lanman.

The Arbitration Agreements state in pertinent part as follows:

"Article 1: **Agreement to Arbitrate**: It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently, or incompetently rendered, will be determined by submission to arbitration…."

"Article 2: **All Claims Must be Arbitrated:** It is the intention of the parties that this agreement bind all parties whose <u>claims may arise out of or relate to treatment or service provided by the physician</u>…." All claims for monetary damages exceeding the jurisdictional limit of the small claims court against the physician, and the physician's partners, associates, association, corporation or partnership, and the employees, agents and estates of any of them, must be arbitrated        including, without limitation, claims for loss of consortium, wrongful death, emotional distress or punitive damages." (Underline emphases only added)

"Article 4: **General Provisions**: All claims based upon the same incident, transaction or related circumstances shall be arbitrated in one proceeding."

Article 5: **Revocation**: "This agreement may be revoked by written notice delivered to the physician within 30 days of signature. It is the intent of this agreement to apply to all medical services rendered any time for any condition."



LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

177182245.1

7

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

As clearly set forth above, the parties mutually agreed to arbitrate claims arising out of or related to the care and treatment and services rendered to Mr. Klayman, including but not limited to the claims pled in this action. Accordingly, Defendant respectfully requests that the Court order all causes of action against the moving Defendant to be adjudicated in binding arbitration. Failure to compel arbitration will deviate from the clear intent of the parties that disputes, such as the instant dispute, be submitted to arbitration. Moreover, failure to compel arbitration will essentially permit plaintiff to use the judicial system to improperly assist in failing to honor a valid and enforceable contract. Accordingly, the instant Motion should be granted.

## III. GOVERNING LAW AND CALIFORNIA PUBLIC POLICY COMPEL ARBITRATION OF THIS MATTER

### A. Legal Standard

Under the Federal Arbitration Act and California law, arbitration agreements such as those entered by Plaintiff are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also* Cal. Code Civ. Proc. § 1281 ("A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract"). Moreover, arbitration is a highly favored means of settling disputes, and the Supreme Court has stated that arbitration agreements "must be 'rigorously enforce[d].'" *Perry v. Thomas*, 482 U.S. 483, 490 (1987) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)) (alteration in *Perry)*; *see also Berman v. Dean Witter & Co., Inc.*, 44 Cal. App. 3d 999, 1003 (1975) (observing that in California "arbitration is highly favored as a method for the settlement of disputes" and collecting cases).

"The [party seeking arbitration] bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving

177182245.1

8

LEWIS BRISBOIS BISGAARD & SMITH LLP
ATTORNEYS AT LAW

by a preponderance of the evidence any fact necessary to its defense." *Bridge Fund Capital Corp. v. Fastbucks Franchise,* 622 F.3d 996, 1005 (9th Cir. 2010) (quoting *Engalla v. Permanente Med. Group, Inc.,* 15 Cal. 4th 951, 972 (1997)); *Rosenthal v. Great Western Fin. Sec. Corp.,* 14 Cal. 4th 394, 413 (1996) (party opposing petition to compel arbitration by challenging enforceability of arbitration agreement bears burden of proving agreement is unenforceable).

Governing authority also dictates that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem. Hospital v. Mercury Construction Corp.*, *460* U.S. 1, 25 (1983); *Pacific Inv. Co. v. Townsend*, 58 Cal. App. 3d 1 (1976) 9-10 ("Courts should indulge every intendment to give effect to such proceedings and order arbitration unless it can be said with assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (internal citations omitted).

Courts have stated that arbitration agreements should be liberally interpreted and that arbitration should be ordered unless the agreement clearly does not apply to the dispute in question. *Weeks v. Crow*, 113 Cal. App. 3d 350, 353 (1980). *In Retail Clerks Union, Local 775 v. Purity Stores, Inc.*, 41 Cal. App. 3d 225, 231 (1974), the court ordered arbitration, stating:

> "Doubts as to whether an arbitration clauses applies are to be resolved in favor of arbitration. [Citation] Arbitration should be ordered "unless it can be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute." [Citations]"

Clearly, this dispute is subject to arbitration as the Agreements on their face reflect that the parties have agreed to resolve any dispute by way of binding arbitration.  Accordingly, the instant Motion to Compel Arbitration should be granted.

### B.    **Plaintiff Himself Executed Both Arbitration Agreement**

As outlined in the attached declaration of Blair Seigel, the 6/25/24 arbitration agreement was sent to plaintiff via Docusign to the email address he had provided (the same email address that plaintiff used to communicate multiple times with

Defendant's office).  Plaintiff executed same on 6/25/24 via Docusign.  (Exhibit "B" to the Declaration of Blair Segel).

The second Arbitration Agreement (same terms as the first Agreement) dated 6/26/24 was presented to plaintiff by Blair Seigel upon his in office consultation with Dr. Lanman.  Plaintiff, after having had an opportunity to read and review same executed the Agreement and returned it to Blair Seigel.  Ms. Seigel executed the Agreement on behalf of Dr. Lanman as she was so authorized to do.  (See Declaration of Blair Segel and Exhibit "A" attached thereto).

As discussed above, plaintiff is an attorney and thus has knowledge of the law, more so than a lay person, and thus cannot credibly claim that he was unaware that executing the arbitration agreement would result in him being bound to adjudicate any and all claims arising out of or related to his care and treatment with Dr. Lanman in binding arbitration.  Accordingly, the subject Motion should be granted.

**C.** **The Claims Asserted In Plaintiff's Complaint Are Explicitly Covered By The  Arbitration Agreements**

Every cause of action in Plaintiff's Complaint is encompassed by the Arbitration Agreements. Specifically, the Complaint asserts causes of action for Medical Negligence, Lack of Informed Consent (despite plaintiff executing a multiple page and highly detailed and thorough consent for surgery form attached to Ms. Seigel's declaration as Exhibit "C"), Fraud / Intentional Misrepresentation, Fraud Concealment, and Fraud Misrepresentation.  The Arbitration Agreements expressly state that they apply to Medical Malpractice, as well as all "claims [that] may arise out of or relate to treatment or service provided by the physician….", as well as "All claims for monetary damages exceeding the jurisdictional limit of the small claims court against the physician….", as well as "All claims based upon the same  incident, transaction or related circumstances…."  (Underline emphases

177182245.1

10

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

added).  As such, the Agreements clealry apply to the dispute in question which arises from plaintiff's consultation and treatment with neurosurgeon Todd Lanman, M.D. and the surgery he performed upon plaintiff.

As the Court is aware, a party to a written contract is charged with having read and understood its contents. *Randas v. YMCA*, 17 Cal. App. 4th 158, 163 (1993). In fact, when a person with the capacity of reading and understanding an instrument signs it, she may not, in the absence of fraud, coercion or excusable neglect, avoid its terms on the ground that he failed to read it before signing it. *Bolanos v. Khalatian*, 231 Cal.App.3d 1586, 1590 (1991). Accordingly, by executing the attached contract, the law presumes that plaintiff read and understood its terms and thus assented to the terms therein. Therefore, the instant Motion should be granted.

Since the claims asserted against the moving Defendant arises from, are related to, and/or have a connection with the care and services rendered to plaintiff, the subject Motion should be granted as that is what the parties clearly intended and contracted to take place.  Accordingly, Defendant respectfully requests that the Court order this entire matter to binding arbitration consistent with the terms of the Arbitration Agreement.

### D.    The Arbitration Agreement cannot be attacked as being a contract of adhesion or unconscionable

*California Code of Civil Procedure (CCP)* 1295 sets forth format and language requirements, of which the instant Agreements abide by; namely the agreements contain the requisite statutory language at Article 1 and contain the requisite red ink all capital letter advisory directly above plaintiff's signature advising that the Agreements are arbitration agreements.  Per *CCP* 1295, any agreement that complies with said code section's requirements is not unconscionable ["Such a contract is not a contract of adhesion, nor unconscionable

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

177182245.1

11

nor otherwise improper, where it complies with subdivisions (a), (b), and (c) of this section"].

Moreover, in light of plaintiff being an attorney he surely cannot credibly claim lack of knowledge when he executed two separate Arbitration Agreements over a period of two days.  The declaration of Blair Seigel also undermines any potential claim of unconscionability.  Given that there must be both procedural and substantive unconscionability in order to not uphold the contractual agreement and none is present as to either category, the subject Motion should be granted. (*Armendariz v. Foundation Health Psychare Services, Inc.* (2000) 24 Cal.4th 83, 106).

Further, "Because of the nature of the warnings on the form, a party attacking the arbitration agreement will doubtless have a difficult time: she will have to explain how her eyes avoided the 10-point red type above the signature lines; she will have to explain why she did not ask any questions about what she was signing; she will have to show that no one...asked her to read it before signing it; and she will have to explain why she did not rescind the agreement within 30 days after it was signed." (*Ramirez v. Superior Court* 103 Cal.App.3d 746 at 756-757).

Moreover, one who signs an instrument may not avoid the impact of its terms on the ground that he or she failed to read or could not read the instrument before signing it.  (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 431 [plaintiffs' "failure to take measures to learn the contents of the document they signed is attributable to their own negligence"]; *Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1674 ["reasonable diligence requires the reading of a contract before signing it.  A party cannot use his own lack of diligence to avoid an arbitration agreement"]; *24 Hour Fitness, Inc. v. Superior Court (*1998) 66 Cal.App.4th 1199, 1215 [rejecting plaintiff's argument that arbitration agreement not binding since she never read employee handbook].)  To hold otherwise, "would

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

permit any party to a contract to avoid a disadvantageous provision by claiming that they were not aware it existed.  That, however, is not the law." (*Mission Viejo Emergency Medical Associates v. Beta Healthcare Group* (2011) 197 Cal.App.4th 1146, 1155.)

In light of the above and the facts presented herein, plaintiff cannot credibly claim the Agreements are unconscionable and thus the instant Motion should be granted.

## IV.    THE DISTRICT COURT MATTER SHOULD BE STAYED PENDING THE HEARING ON THIS MOTION AND SHOULD REMAIN STAYED PENDING THE COMPLETION OF ARBITRATION

9 *U.S. Code* Section 3 states,

> "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending,  upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, **shall** on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration. (Emphases added)

Further, CCP 1281.4 states,

> "If a court of competent jurisdiction, whether in this State or not, has ordered arbitration of a controversy which is an issue involved in an action or proceeding pending before a court of this State, the court in which such action or proceeding is pending **shall**, upon motion of a party to such action or proceeding, stay the action or proceeding until an arbitration is had in accordance with the order to arbitrate or until   such earlier time as the court specifies.

> If an application has been made to a court of competent jurisdiction, whether in this State or not, for an order to arbitrate a controversy which is an issue involved in an action or

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

proceeding pending before a court of this State and such application is undetermined, the court in which such action or proceeding is pending **shall**, upon motion of a party to such action or proceeding, stay the action or proceeding until the application for an order to arbitrate is determined and, if arbitration of such controversy is ordered, until an arbitration is had in accordance with the order to arbitrate or until such earlier time as the court specifies." (Emphases added)

Accordingly, the District Court matter must be stayed pending the hearing and ruling on the instant Petition and should remain stayed pending the completion of arbitration to enforce any arbitration award, if applicable.

## V. <u>CONCLUSION</u>

Defendant has met the sole burden placed upon it by the law: demonstrating the existence of an arbitration agreement covering the asserted claims. That is all that is needed to send this case to arbitration. Defendant therefore respectfully requests that the Court issue an order compelling arbitration of all claims in this action, and staying all further proceedings in the District Court action pending the completion of binding arbitration.

DATED:  May  26, 2026        KATHLEEN M. WALKER
                              JEFFREY S. HEALEY
                              LEWIS BRISBOIS BISGAARD & SMITH LLP


                              By: _____/s/_____
                                  JEFFREY S. HEALEY, ESQ.
                                  Attorneys for Defendant, TODD
                                  LANMAN

**DECLARATION OF JEFFREY S. HEALEY**

## <u>DECLARATION OF JEFFREY S. HEALEY, ESQ.</u>

I, JEFFREY S. HEALEY, declare as follows:

1.       I am an attorney duly licensed to practice in the state of California.  I am a Partner with the firm of Lewis Brisbois Bisgaard & Smith, attorneys of record for Defendant, TODD LANMAN, M.D.  I have personal knowledge of the facts contained herein and if called to testify I could and would do so competently.

2.       On 5/19/26, I drafted and had sent to Larry Klayman the correspondence attached hereto as Exhibit "A".  The attached correspondence was prepared in accordance with LR 7 – 3.  Said letter included therewith a true and correct copy of the release of liability letter Mr. Klayman singed via Docusign on 10/15/25 and the Docusign Certificate of competition, as well as the two arbitration agreements Mr. Klayman singed; one via Docusign on 6/25/24 and the other in person during an in office consultation with Dr. Lanman on 6/26/24.  (See Declaration of Blair Siegel submitted herewith).

3.       The 5/19/26 correspondence requested that plaintiff dismiss the action in light of the release he executed on 10/15/25 in exchange for a refund of $11,250 from Dr. Lanman.  The above correspondence also requested that Mr. Klayman stipulate to adjudicate this matter in binding arbitration in light of the multiple arbitration agreements he executed should he elect not to dismiss the action.

4.       On 5/19/26, Mr. Klayman responses to the above correspondence but directed said correspondence to my secretary only, Leticia Rodriguez.  Therein, Mr. Klayman did not substantively respond to my request that he dismiss the action, nor did he substantively respond to my request that he stipulate to adjudicate this matter in binding arbitration.  Instead, he made an overture for resolution of the claim in exchange for money.

5.       On 5/21/26, I sent additional correspondence to Mr. Klayman since his above correspondence did not address my above-mentioned inquiries.  This

177182245.1

15

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

correspondence inquired into whether Mr. Klayman would be willing to discuss telephonically the issues addressed in the 5/19/26 letter and proposed 5/22 at Noon for said conversation.  Attached as Exhibit "B" is a true and correct copy of said correspondence.

6.    On 5/22/26, Mr. Klayman and I spoke telephonically.  He reaffirmed his aforementioned contention that he did not sign a release of liability despite the written evidence suggesting otherwise, and he declined to agree to send the instant dispute to binding arbitration.  He did acknowledge that he had no contention that the arbitration agreements at issue were obtained fraudulently and/ or were not executed by him.

7.    Attached hereto as Exhibit "C" is a true and correct copy of the opinion of the Court in *In re Bundy*, 840 F.3d 1034, 1046 (9th Cir. 2016).

8.    In light of Mr. Klayman's refusal to dismiss the instant action and/or to stipulate to adjudicate same in binding arbitration Defendant is left with no other recourse but to move to enforce the arbitration agreements and thereafter to move to have the matter dismissed once the proper venue (arbitration) is determined.

I declare under penalty of perjury that the foregoing are true and correct. Executed this 26th day of May 2026 at Los Angeles, California

_____/s/_____
JEFFREY HEALEY


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

177182245.1

16

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER

**EXHIBIT A**



Jeffrey S. Healey
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Jeffrey.Healey@lewisbrisbois.com
Direct: 213.580.6332

May 19, 2026                                               File No. 43090-56

**CONFIDENTIAL SETTLEMENT COMMUNICATIONS**
**EVIDENCE CODE § 1152**

**<u>VIA ELECTRONIC MAIL ONLY</u>**
Larry Klayman, ESq.
Email: leklayman@gmail.com)

> Re:  **Larry Klayman**
>      **Our Client: Todd Lanman, M.D.**

Dear Mr. Klayman:

The District Court recently granted Mr. Pierce's Request for Approval of Withdrawal of Counsel.  As such, this correspondence is being addressed to you and not Mr. Pierce.

Please allow to serve as our attempt to meet and confer in good faith regarding the above referenced matter.  On 10/15/2025, you executed a release of any claims or actions related to your treatment with our client, Dr. Lanman, in exchange for a refund of the $11,250 you had paid Dr. Lanman up to that point.  You also had an outstanding balance owed of $33,750 when the release was singed, despite your previous assurances that the balance would be paid in full.  The release is attached for ease of reference and was executed via Docusign.  The Docusign Certificate of Completion is also attached showing the release document was sent to you, opened and viewed by you, signed by you and returned to Dr. Lanman.  Thereafter, you picked up and deposited the check for $11,250.  As an attorney, you clearly understood what you were signing and the consequences of same.  Accordingly, the instant matter should be dismissed forthwith.

In the event a dismissal is not forthcoming, this action should be stayed and submitted to binding arbitration consistent with the arbitration agreements you executed.  Attached please find the 6/25/24 arbitration agreement you executed via Docusign, as well as the 6/26/24 arbitration agreement that you executed while attending an in office consultation with Dr. Lanman.  The agreements clearly call for any and all disputes to be adjudicated in arbitration.  Accordingly, Defendant hereby demands that if the instant action is not dismissed that you stipulate to adjudicate the claims made in binding arbitration and to stay the District Court matter pending the completion of arbitration who can affirm thereafter any arbitration order entered.

Larry Klayman, Esq.
May 19, 2026
Page 2

Should you have any questions, please let me know. Thank you.

Very truly yours,

*Jeffrey S. Healey*

Jeffrey S. Healey of
LEWIS BRISBOIS BISGAARD & SMITH LLP

JSH:lr

Enclosure: Release Document and Docusign Certificate of Completion, Arbitration Agreement

cc: Kathleen Walker, Esq.

176903600.1

Docusign Envelope ID: 5AE8D411-8805-492B-B362-2D822EA17262



**Todd H. Lanman, M.D., Inc.**
450 N. Roxbury Dr. 3rd Floor
Beverly Hills, CA 90210

P 310.385.7766
F 310.385.9007
www.spine.md

Dear Mr. Klayman,

We deeply value the trust you place in us, and we acknowledge that this has been a difficult experience. While we believe that Dr. Lanman took all appropriate steps to properly diagnose and treat your condition, we also recognize the importance of addressing your concerns.

As a gesture of goodwill, and in the spirit of maintaining a positive relationship, we are mailing you a refund in the amount of $11,250.00. This is not an admission of guilt or wrongdoing, but rather an expression of our desire to provide some measure of resolution and support for you during this time.

We hope this gesture reflects our commitment to your well-being and our respect for the trust you place in us. We kindly ask that you consider not pursuing any legal action or claims against Dr. Lanman or the practice related to your care.

Thank you for giving us the opportunity to care for you. We truly wish you the best on your health journey.

Warmest regards,

Arlene Macpherson
Account Manager

Acceptance of Terms
By signing below, I, Larry Klayman acknowledge and accept the terms outlined in this letter, including the receipt of $11,250.00 as a refund. I also agree to release Dr. Lanman from any claims or actions related to my treatment.

**Patient:**

Signature: *Larry Klayman*
Name: Larry Klayman
Date: 10/15/2025

**Todd H. Lanman, M.D., Inc:**

Signature:
Name: Todd H. Lanman, M.D.
Date: 10/15/2025

docusign

## Certificate Of Completion

Envelope Id: 5AE8D411-8805-492B-B362-2D822EA17262                    Status: Completed
Subject: Complete with Docusign: Klayman, Larry- refund.pdf
Source Envelope:
Document Pages: 1                       Signatures: 1               Envelope Originator:
Certificate Pages: 4                    Initials: 0                Arlene Macpherson
AutoNav: Enabled                                                   450 N. Roxbury Dr. 3rd floor
EnvelopeId Stamping: Enabled                                       Beverly Hills, CA  90210
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                  surgery@spine.md
                                                                  IP Address: 76.22.218.181

## Record Tracking

Status: Original                        Holder: Arlene Macpherson      Location: DocuSign
        10/15/2025 9:28:41 AM                   surgery@spine.md

| Signer Events | Signature | Timestamp |
|---|---|---|
| Larry Klayman<br>leklayman@gmail.com<br>Security Level: Email, Account Authentication (None) | *larry klayman*<br>DocuSigned by:<br>A44EBE3A4C794E5...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 23.241.29.17 | Sent: 10/15/2025 10:18:29 AM<br>Viewed: 10/15/2025 11:26:16 AM<br>Signed: 10/15/2025 11:27:04 AM |

**Electronic Record and Signature Disclosure:**
  Accepted: 10/15/2025 11:26:16 AM
  ID: d1d844dc-0a9d-402b-a419-1854933c4845

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 10/15/2025 10:18:29 AM |
| Certified Delivered | Security Checked | 10/15/2025 11:26:16 AM |
| Signing Complete | Security Checked | 10/15/2025 11:27:04 AM |
| Completed | Security Checked | 10/15/2025 11:27:04 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

## PHYSICIAN-PATIENT ARBITRATION AGREEMENT

**Article 1: Agreement to Arbitrate:** It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently, or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.

**Article 2: All Claims Must be Arbitrated:** It is the intention of the parties that this agreement bind all parties whose claims may arise out of or relate to treatment or service provided by the physician including any spouse or heirs of the patient and any children, whether born or unborn, at the time of the occurrence giving rise to any claim. In the case of any pregnant mother, the term "patient" herein shall mean both the mother and the mother's expected child or children.

All claims for monetary damages exceeding the jurisdictional limit of the small claims court against the physician, and the physician's partners, associates, association, corporation or partnership, and the employees, agents and estates of any of them, must be arbitrated including, without limitation, claims for loss of consortium, wrongful death, emotional distress or punitive damages. Filing of any action in any court by the physician or patient to collect or contest any medical fee shall not waive the right to compel arbitration of any malpractice claim. However, following the assertion of any malpractice claim, any fee dispute, whether or not the subject of any existing court action, shall also be resolved by arbitration.

**Article 3: Procedures and Applicable Law:** A demand for arbitration must be communicated in writing to all parties. Each party shall select an arbitrator (party arbitrator) within thirty days and a third arbitrator (neutral arbitrator) shall be selected by the arbitrators appointed by the parties within thirty days of a demand for a neutral arbitrator by either party. Each party to the arbitration shall pay such party's pro rata share of the expenses and fees of the neutral arbitrator, together with other expenses of the arbitration incurred or approved by the neutral arbitrator, not including counsel fees or witness fees, or other expenses incurred by a party for such party's own benefit. The parties agree that the arbitrators have the immunity of a judicial officer from civil liability when acting in the capacity of arbitrator under this contract. This immunity shall supplement, not supplant, any other applicable statutory or common law.

Either party shall have the absolute right to arbitrate separately the issues of liability and damages upon written request to the neutral arbitrator.

The parties consent to the intervention and joinder in this arbitration of any person or entity which would otherwise be a proper additional party in a court action, and upon such intervention and joinder any existing court action against such additional person or entity shall be stayed pending arbitration.

The parties agree that provisions of California law applicable to health care providers shall apply to disputes within this arbitration agreement, including, but not limited to, Code of Civil Procedure Sections 340.5 and 667.7 and Civil Code Sections 3333.1 and 3333.2. Any party may bring before the arbitrators a motion for summary judgment or summary adjudication in accordance with the Code of Civil Procedure. Discovery shall be conducted pursuant to Code of Civil Procedure section 1283.05; however, depositions may be taken without prior approval of the neutral arbitrator.

**Article 4: General Provisions:** All claims based upon the same incident, transaction or related circumstances shall be arbitrated in one proceeding. A claim shall be waived and forever barred if (1) on the date notice thereof is received, the claim, if asserted in a civil action, would be barred by the applicable California statute of limitations, or (2) the claimant fails to pursue the arbitration claim in accordance with the procedures prescribed herein with reasonable diligence. With respect to any matter not herein expressly provided for, the arbitrators shall be governed by the California Code of Civil Procedure provisions relating to arbitration.

**Article 5: Revocation:** This agreement may be revoked by written notice delivered to the physician within 30 days of signature. It is the intent of this agreement to apply to all medical services rendered any time for any condition.

**Article 6: Retroactive Effect:** If patient intends this agreement to cover services rendered before the date it is signed (including, but not limited to, emergency treatment) patient should initial below:

**Effective as of the date of first medical services**

X _____

Patient's or Patient Representative's Initials

If any provision of this arbitration agreement is held invalid or unenforceable, the remaining provisions shall remain in full force and shall not be affected by the invalidity of any other provision.

I understand that I have the right to receive a copy of this arbitration agreement. By my signature below, I acknowledge that I have received a copy.

**NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.**

By _____    6/26/24    By: X _____    6/26/24

Physician's or Authorized Representative's Signature    (Date)    Patient's or Patient Representative's Signature    (Date)

Todd Canman MD    By: X _____

Print or Stamp Name of Physician, Medical Group, or Association Name    Larry Klogman    Print Patient's Name

_____

(If Representative, Print Name and Relationship to Patient)

A signed copy of this document is to be given to the Patient. Original is to be filed in Patient's medical records.

(9-13)

# PHYSICIAN-PATIENT ARBITRATION AGREEMENT

**Article 1: Agreement to Arbitrate:** It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently, or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review or arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional rights to have any such dispute decided on a court of law before a jury, and instead are accepting the use of arbitration.

**Article 2: All Claims Must be Arbitrated:** It is the intention of the parties that this agreement bind all parties whose claims may arise out of or related to treatment or service provided by the physician including any spouse or heirs of the patient and any children, whether bron or unborn, at the time of the occurrence giving rise to any claim. In the case of any pregnant mother, the term "patient" herein shall mean the mother and the mother's expected child or children.

All claims for monetary damages exceeding the jurisdictional limit of the small claims court against the physician, and the physician's partners, associates, association, corporation or partnership, and the employees, agents and estates of any if them, must be arbitrated including, without limitation, claims for loss of consortium, wrongful death, emotional distress or punitive damages. Filing of any court by the physician to collect any fee from the patient shall not waive the right to compel arbitration of any malpractice claim.

**Article 3: Procedures and Applicable Law:** A demand for arbitration must communicate in writing to all parties. Each party shall select an arbitrator (party arbitrator) within thirty days and a third arbitrator (neutral arbitrator) shall be selected by the arbitrators appointed by the parties within thirty days of a demand for a neutral arbitrator by either party. Each party to the arbitration shall pay such party's pro rata share of the expenses and fees of the neutral arbitrator, together with other expenses of the arbitration incurred or approved by the neutral arbitrator, not including counsel fees or witness fees, or other expenses incurred by a party for such party's own benefit. The parties agree that the arbitrators have the immunity of a judicial officer from civil liability when acting in the capacity of arbitrator under this contract. This immunity shall supplement, nit supplant, any other applicable statutory or common law.

Either party shall have the absolute right ti arbitrate separately the issues of liability and damages upon written request to the neutral arbitrator.

The parties consent to the intervention and joinder in this arbitration of any person or entity which would otherwise be a proper additional party in a court action, and upon such intervention and joinder any existing court action against such additional person or entity shall be stayed pending arbitration.

The parties agree that provisions of California law applicable to health care providers shall apply to disputes within this arbitration agreement, including, but not limited to, Code of Civil Procedure Section 340.5 and 667.7 and Civil Code Sections 3333.1 and 3333.2. Any party may bring before the arbitrations a motion for summary judgment or summary adjudication in accordance with the Code of Civil Procedure. Discovery shall be conducted pursuant to Code of Civil Procedure section 1283.05, however, depositions may be taken without prior approval of the neutral arbitrator.

**Article 4: General Provisions:** All claims based upon the same incident, transaction or related circumstances shall be arbitrated in once proceeding. A claim shall be waived and forever barred if (1) on the date notice thereof is received, the claim, if asserted in a civil action, would be barred by the applicable California statute of limitations, or (2) the claimant fails to pursue the arbitration claim in accordance with the procedures prescribed herein with reasonable diligence. With respect to any matter not herein expressly provided for, the arbitrators shall be governed by the California Code of Civil Procedure provisions relating to arbitration.

**Article 5: Revocation:** This agreement may be revoked by written notice delivered to the physician within 30 days, or signature. It is the intent of this agreement to apply to all medical services rendered any time for any condition.

**Article 6: Retroactive Effect:** If patient intends this agreement to cover services rendered before the date it is Effective as of the date of first medical services.

_____
Patient's or Patient Representative's Initials

If any provision if this arbitration agreement is held invalid of unenforceable, the remaining provisions shall remain in full force and shall not be affected by the invalidity of any other provision.

I understand that I have the right to receive a copy of this arbitration agreement. By my signature below, I acknowledge that I have received a copy.

**NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.**

06/25/2024

By: _Larry Klayman_ _____

Patient's or Patient Representative's Signature    (Date)

By: _____    _____    Larry Klayman
Physician's or Authorized Representative's    (Date)    By: _____
Signature   Todd H. Lanman, M.D., Inc.                     Print Patient's Name

_____
       Jason M. Cuellar, M.D., Inc.                  _____
Print or Stamp Name of Physician,                  (If Representative, Print Name and Relationship to Patient)
Medical Group or Association Name

A signed copy of this document is to be given to Patient. Original is to be files in Patient's medical records.

**EXHIBIT B**



Jeffrey S. Healey
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Jeffrey.Healey@lewisbrisbois.com
Direct: 213.580.6332

May 21, 2026

File No. 43090.56

<u>**VIA ELECTRONIC MAIL ONLY**</u>

Larry Klayman, Esq.
7050 W. Palmetto Park Road
Boca Raton, FL 33433
Email: leklayman@gmail.com)

  **Re:**   **Larry Klayman**
     **Our Client: Todd Lanman, M.D.**

Dear Mr. Klayman:

  Please advise if you are available for a call around Noon on 5/22/26 so that we can discuss this matter and whether you are willing to 1) dismiss the matter in light of the release you signed and/or 2) stipulate to adjudicate the instant dispute in binding arbitration pursuant to the terms of the arbitration agreements you executed.  If you are available, my secretary will circulate the call-in number.  Thank you.

      Verv trulv vours,

      Jeffrey S. Healey of
      LEWIS BRISBOIS BISGAARD & SMITH LLP

JSH: lr

ARIZONA • CALIFORNIA • COLORADO • CONNECTICUT • DELAWARE • FLORIDA • GEORGIA • ILLINOIS • INDIANA • KANSAS • KENTUCKY • LOUISIANA

MARYLAND •MASSACHUSETTS • MINNESOTA • MISSISSIPPI • MISSOURI • NEVADA • NEW JERSEY • NEW MEXICO • NEW YORK • NORTH CAROLINA

OHIO • OREGON • PENNSYLVANIA • RHODE ISLAND • TENNESSEE • TEXAS • UTAH • VIRGINIA • WASHINGTON • WASHINGTON D.C. • WEST VIRGINIA

177038606.1

**EXHIBIT C**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE CLIVEN D. BUNDY, | No. 16-72275 |
| CLIVEN D. BUNDY, AKA Cliven Bundy,<br><br>*Petitioner*, | D.C. No.<br>2:16-cr-00046-<br>GMN-PAL-1 |
| v. | OPINION |
| UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA, LAS VEGAS,<br><br>*Respondent*,<br><br>UNITED STATES OF AMERICA,<br>*Real Party in Interest*. | |

Petition for Writ of Mandamus
Argued and Submitted October 21, 2016

Filed October 28, 2016

Before: William A. Fletcher, Ronald M. Gould,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Gould

2                         IN RE BUNDY

## SUMMARY*

### Mandamus/Pro Hac Vice

The panel denied denied Cliven Bundy's petition for a writ of mandamus seeking to force the district court to admit attorney Larry Klayman *pro hac vice* in Bundy's high-profile criminal trial.

The panel held that the district court did not abuse its discretion, much less commit clear error, in denying Klayman *pro hac vice* status, where Klayman is involved in an ethics proceeding before the District of Columbia Bar and was not candid with the court about the status of those proceedings; where he disclosed that he was twice barred in perpetuity from appearing *pro hac vice* before judges in the Central District of California and the Southern District of New York, but failed to list numerous cases in which he has been reprimanded, denied *pro hac vice* status, or otherwise sanctioned for violating various local rules; and where he has a record of going after judges personally, and shortly after Chief Judge Navarro denied his application, Bundy filed a frivolous *Bivens* action against her in her own court.

Dissenting, Judge Gould wrote that despite the majority's expressed apprehensions about Klayman's willingness to follow the rules of professional conduct and the orders of the district court, he would hold that the writ should issue because his concerns about the defendant's ability to present

---

\* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a strong defense and receive a fundamentally fair trial are too great.

---

## COUNSEL

Larry Klayman (argued), Klayman Law Firm, Washington, D.C.; Joel F. Hansen, Hansen Rasmussen LLC, Las Vegas, Nevada; for Petitioner.

Elizabeth O. White (argued), Appellate Chief and Assistant United States Attorney; Daniel G. Bogden, United States Attorney; United States Attorney's Office, Reno, Nevada; for Real Party in Interest.

---

## OPINION

BYBEE, Circuit Judge:

Attorney Larry Klayman applied to be admitted *pro hac vice* in the high-profile criminal trial of Cliven Bundy. The district court denied his application without prejudice. Bundy has now asked this court for a writ of mandamus to force the district court to admit Klayman. We decline to do so. Under our decisions, the district court had more than ample cause to turn down Klayman's application: he is involved in an ethics proceeding before the District of Columbia Bar, and he was not candid with the court about the status of those proceedings; he disclosed that he was twice barred *in perpetuity* from appearing *pro hac vice* before judges in the Central District of California and the Southern District of New York, but he failed to list numerous cases—all available on Westlaw or LEXIS—in which he has been reprimanded,

denied *pro hac vice* status, or otherwise sanctioned for violating various local rules; and he has a record of going after judges personally, and shortly after Chief Judge Gloria Navarro denied his application, Bundy filed a frivolous *Bivens* action against her in her own court. This litany of reasons for denying Klayman *pro hac vice* status demonstrates that the district court did not abuse its discretion, much less commit clear error.

## I. FACTUAL BACKGROUND AND PROCEEDINGS

### A. *Factual Background*

According to the indictment, in early April 2014, Petitioner Bundy and his codefendants were involved in an armed stand-off around Bunkerville, Nevada, with agents of the Bureau of Land Management ("BLM"). Following a more than twenty-year legal battle over grazing fees on public lands, the federal courts authorized the BLM to remove some 400 head of Bundy's cattle from public lands. *See, e.g.*, *United States v. Bundy*, 2013 WL 3463610 (D. Nev. July 9, 2013). In response to the BLM's attempts to settle the dispute peacefully, Bundy said that he was "ready to do battle" and "do whatever it takes" to keep the cattle. Over the course of a week, hundreds of Bundy's supporters congregated near Bunkerville to prevent the BLM from removing Bundy's cattle. Many of Bundy's supporters were armed, and the BLM agents ultimately withdrew from the area. The incident attracted national, and even international, attention.[1]

---

[1] The incident has its own Wikipedia page. *Bundy Standoff*, Wikipedia (Oct. 27, 2016, 1:54 PM), https://en.wikipedia.org/wiki/Bundy_standoff.

On March 2, 2016, a federal grand jury in the District of Nevada returned a sixteen-count superseding indictment against Bundy, four of his sons, and fourteen others.  The indictment charged them with Conspiracy to Commit an Offense Against the United States, 18 U.S.C. § 371; Conspiracy to Impede or Injure a Federal Officer, 18 U.S.C. § 372; Use and Carry of a Firearm in Relation to a Crime of Violence, 18 U.S.C. § 924(c); Assault on a Federal Officer, 18 U.S.C. § 111(a)(1), (b); Threatening a Federal Law Enforcement Officer, 18 U.S.C. § 115(a)(1)(B); Obstruction of the Due Administration of Justice, 18 U.S.C. § 1503; Interference with Interstate Commerce by Extortion, 18 U.S.C. § 1951; and Interstate Travel in Aid of Extortion, 18 U.S.C. § 1952.

## B.  *Proceedings Before the District Court*

### 1.  Klayman's Petition for *Pro Hac Vice* Admission

Following his indictment, Bundy secured local counsel, Joel Hansen.[2]  He also secured the services of Larry Klayman, a member of the District of Columbia and Florida Bars.  Under Local Rules for the United States District Court of Nevada, an attorney who has been retained to appear in a particular case but is not a member of the bar of the district court "may appear only with the court's permission . . . by verified petition on the form furnished by the clerk."  Nev. Dist. Ct. Local R. IA 11-2(a).  The Rule further states that "[t]he court may grant or deny a petition to practice under this

---

[2] Due to health concerns, Hansen requested permission to withdraw from the case.  The district court approved his request upon the condition that Bundy find substitute local counsel.  On October 24, 2016, Nevada attorney Bret Whipple entered his appearance on behalf of Bundy.

rule." *Id.* 11-2(h); *see also id.* 11-2(i) ("When all the provisions of this rule are satisfied, the court may enter an order approving the verified petition for permission to practice in the particular case.").

On March 22, 2016, Klayman filed a Verified Petition stating that he had been retained by Bundy in connection with the Nevada indictment and requesting *pro hac vice* admission to practice before the district court. Of relevance to this petition for a writ of mandamus is the fifth question on the district court's form, which reads:

> That there are or have been no disciplinary proceedings instituted against petitioner, nor any suspension of any license, certificate or privilege to appear before any judicial, regulatory or administrative body, or any resignation or termination in order to avoid disciplinary or disbarment proceedings, except as described in detail below.

Klayman wrote in response: "The only disciplinary case pending is in the District of Columbia" and that he has "responded to a few complaints." He elaborated in an attached statement.

With respect to the disciplinary case in the District of Columbia, Klayman stated that he had represented clients, pro bono, against his former employer, Judicial Watch.[3] He

---

[3] Klayman was the CEO and General Counsel of Judicial Watch. Klayman founded Judicial Watch in 1994 and left in 2003. According to its current website, Judicial Watch is a "conservative, non-partisan educational foundation[] [that] promotes transparency, accountability and

represented that "[t]he matter is likely to be resolved in my favor and there has been no disciplinary action."

As to other complaints, he explained that he "agreed to a public reprimand before The Florida Bar" for failing to timely pay a mediated settlement to a client, but that there was "no showing of dishonesty" and he was never suspended from the practice of law.  Separately, Klayman revealed that, roughly twenty years ago, "two judges vindictively stated that I could not practice before them after I challenged rulings they had made on the basis of bias and prejudice."  He explained that those exclusions applied only to the two judges themselves, Judge William D. Keller of the U.S. District Court for the Central District of California and Judge Denny Chin of the U.S. District Court for the Southern District of New York. Moreover, he advised that the "bars of the District of Columbia and Florida reviewed these rulings and found that I did not act unethically" and that he was currently in good standing in both jurisdictions.

## 2.   The District Court's March 31 Order

The district court denied the Verified Petition "for failure to fully disclose disciplinary actions and related documents." The district court found that Klayman's statement that the matter regarding Judicial Watch from the District of Columbia "is likely to be resolved in my favor and there has been no disciplinary action" was "misleading and incomplete."  Referring to the evidence it had found on its own initiative, the district court pointed out that the District

---

integrity in government, politics and the law." *About Judicial Watch*, Judicial Watch, http://www.judicialwatch.org/about (last visited Oct. 25, 2016).

8                            IN RE BUNDY

of Columbia Court of Appeals Board on Professional Responsibility had received an Affidavit of Negotiated Discipline from Klayman and a Petition for Negotiated Discipline, signed by Klayman and counsel for the D.C. Bar, in which Klayman consented to public censure. Neither of these documents had been disclosed by Klayman. Because these documents were "admissions of three separate incidents of stipulated misconduct that were not clearly disclosed in Klayman's Verified Petition," the district court denied the petition, but without prejudice. The district court then explained:

> Should Klayman wish to file a new Verified Petition with the Court, the following information should be included: (1) the case numbers for the cases before Judge William D. Keller and Judge Denny Chin that resulted in these judges precluding Klayman's practice before them; (2) verification of the review by the Bar Associations of the District of Columbia and Florida finding that Klayman did not act unethically before Judges Keller and Chin; (3) an updated Certificate of Good Standing from the Supreme Court of Florida; (4) the Florida Bar Association's reprimand verifying that there was no showing of dishonesty in connection with their disciplinary action; (5) the Exhibits attached to this Order; and (6) verification that the matter in the District of Columbia disciplinary case referenced in the Verified Petition has been resolved with no disciplinary action.

### 3. Klayman's Supplemental Petition

Klayman filed a "Supplement to and Renewed Petition" on April 7, 2016.[4] Klayman provided evidence and explanations for items (1)–(5) of the district court's requirements as follows: (1) he provided the case names and citations for the actions regarding Judges William D. Keller and Denny Chin; (2) he provided a letter from the D.C. Bar finding no ethical violation in the Keller and Chin matters, but said that the Florida Bar's files were no longer accessible; (3) he provided an updated letter of good standing from the Supreme Court of Florida; (4) he provided a copy of Florida's reprimand; and (5) he provided the exhibits attached to the March order.

As to the district court's sixth requirement, Klayman disputed the conclusion the district court drew from the documents it had identified. The court, he said, "appears to have misunderstood the nature and current posture of the disciplinary proceeding underway" in the District of Columbia.

> [T]he prior attempted negotiated discipline never entered into effect . . . . Bar Counsel and Mr. Klayman had attempted to resolve the matter by agreement, but Mr. Klayman later thought the better of having signed the affidavit and agreeing to negotiated discipline it [sic] since he feels strongly that he acted ethically at all times.

---

[4] The district court noted that, contrary to its order, Klayman did not file a new Verified Petition. Thus, it construed Klayman's Renewed Petition as a request for reconsideration of the original Verified Petition.

10                              IN RE BUNDY

He also supplied a copy of a letter opinion prepared by Professor Ronald Rotunda of Chapman University School of Law.  Rotunda, who is well known in academic circles for his expertise in legal ethics and constitutional law, stated that it "is [his] expert opinion that in the [D.C. matter] Mr. Klayman has not committed any offense that merits discipline." Klayman attached what he characterized as "a post-hearing brief" that he had filed with the D.C. Bar.  Klayman, however, did not explain what the "hearing" was to which he had appended his "post-hearing brief," and the brief itself did not explain the procedural posture of the proceedings before the D.C. Bar.  Klayman repeated that he was "confident of ultimately prevailing . . . . since the ultimate finding of the Committee which heard the evidence is simply a recommendation."  Again, Klayman did not identify what the "Committee" was, what the "evidence" was, or to what the "ultimate finding" or "recommendation" referred.

   4.  The District Court's April 19 Order

   The district court treated Klayman's renewed filing as a request for reconsideration and denied it on April 19, 2016. The district court said nothing about five of the six conditions it imposed in the March 31 Order.  It only discussed the matter before the D.C. Bar.  The court noted that Klayman "admits that [the D.C. matter] is still pending," and thus there was "no error with its prior ruling."  The court ordered that "Klayman's Verified Petition shall remain denied without prejudice until such time as Klayman can provide proof that the ethical disciplinary proceeding in the District of Columbia has been resolved in his favor."

IN RE BUNDY                                          11

## C.  *Mandamus Proceedings*

On July 6, 2016, Bundy filed an emergency petition with this court for a writ of mandamus requesting that the district court be ordered to admit Klayman *pro hac vice*.  Bundy argued that his Sixth Amendment right to counsel would be violated if he were forced to go to trial without his attorney of choice.  He claimed that the district court "mechanistically" required that Klayman could not be admitted until the outcome of the D.C. Bar proceeding was known.  Bundy represented that Klayman had "correctly informed the judge that the proceeding was underway and would not be finished for another few years and that Mr. Klayman had not been found liable of any ethics violations by the District of Columbia Bar."  He further represented that the "slow pace of the District of Columbia Bar should not create any assumption that that case is in any way serious, complex, or difficult."  He repeated that Klayman has "continuously been a member in good standing of the District of Columbia Bar for over 36 years and has never been disciplined" and that even if the D.C. Bar complaint were decided against him, "that would still not justify denial of Klayman's application to appear *pro hac vice*."

We ordered expedited review of the petition and directed the United States, as the real party in interest, to file an answer; we invited the district court to address the petition "if it so desires."  We received separate responses from the United States and the district court.

The United States "respectfully decline[d] to opine on the ultimate question whether Klayman should be allowed to represent [Bundy]."  The government nevertheless defended the district court's judgment as "within its discretion."  It

12                          IN RE BUNDY
_____

catalogued other cases in which Klayman was reprimanded by various courts for speaking after the judge requested silence, making misrepresentations to the court, ignoring court-imposed procedures and deadlines, pursuing meritless claims, making accusations related to a judge's race, and refusing to comply with local rules.

The district court not only defended the grounds on which it had issued its prior orders, it offered new evidence and grounds for refusing to grant Klayman *pro hac vice* status. First, the district court reiterated that the still-pending disciplinary proceedings in the District of Columbia raised ethical concerns. The court then challenged the veracity of how Klayman described the current status of the proceedings. Rather than "withdraw[ing] his affidavit because he felt strongly that he had acted ethically," as Klayman claimed, the district court unearthed evidence that

> the District of Columbia Hearing Committee reviewed Klayman's Petition for Negotiated Discipline and rejected it. The Hearing Committee rejected Klayman's affidavit because it determined that the "agreed-upon sanction of public censure is unduly lenient." As such, Klayman failed to disclose the actual current disposition of his pending District of Columbia disciplinary case, and instead provided false information to this Court by stating that he withdrew his affidavit when, in fact, the Hearing Committee rejected it.

Second, the district court also felt that Klayman had filed an incomplete and inaccurate Verified Petition because he had failed to mention "numerous other courts' findings that he is

unfit to practice," and the court cited eight cases in which courts had commented on his "inappropriate and unethical behavior." Third, the district court pointed to a Second Circuit decision in which that court dismissed his challenge to the district court's impartiality because it was "insulting and smacked of intimidation." *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998). The district court then observed that Bundy recently filed a "similar[]" civil suit against the district judge individually, President Obama, and Senator Harry Reid, alleging a conspiracy. *See Bundy v. Obama*, No. 2:16-cv-1047-JCM-GWF (D. Nev. dismissed with prejudice Oct. 12, 2016). The district court thus argued that it did not abuse its discretion because Klayman's record shows a "total disregard for the judicial process" and his admission *pro hac vice* would thus "impede the orderly administration of justice."

Klayman did not respond to the district court's new evidence that he had misrepresented the proceedings in the District of Columbia, nor did he address the cases cited by the district court or the United States in which he had been reprimanded by the courts for his conduct during the litigation. Instead, he claimed that this evidence was "not on the record before the District Court" and was "simply an *ex post facto*, non-meritorious attempt to justify the denial now that this Court has granted expedited review of the mandamus petition." Klayman then repeated his claim that the affidavit had been withdrawn and that "he has a strong case for ultimately prevailing on the merits."

We held oral argument on an expedited basis and heard from Klayman and the United States.

14                     IN RE BUNDY

## II. STANDARDS FOR ISSUING A WRIT OF MANDAMUS

Mandamus "is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380 (2004) (quoting *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947)). "As the writ is one of 'the most potent weapons in the judicial arsenal,' three conditions must be satisfied before it may issue." *Id.* (citation omitted). "First, 'the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires . . . .'" *Id.* (first alteration in original) (quoting *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 403 (1976)). Second, the petitioner must show that "[his] right to issuance of the writ is 'clear and indisputable.'" *Id.* at 381 (alteration in original) (quoting *Kerr*, 426 U.S. at 403). "Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.*

To determine whether mandamus relief is appropriate, we weigh the five factors that we originally enumerated in *Bauman v. U.S. District Court*, 557 F.2d 650 (9th Cir. 1977):

> (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first.) (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district

court's order raises new and important problems, or issues of law of first impression.

*Id.* at 654–55 (citations omitted).[5]  These factors are not exhaustive, *see In re Cement Antitrust Litig.*, 688 F.2d 1297, 1301 (9th Cir. 1982), and "should not be mechanically applied," *Cole v. U.S. Dist. Court*, 366 F.3d 813, 817 (9th Cir. 2004).  However, "the absence of factor three—clear error as a matter of law—will always defeat a petition for mandamus." *In re United States*, 791 F.3d 945, 955 (9th Cir. 2015) (quoting *DeGeorge v. U.S. Dist. Court*, 219 F.3d 930, 934 (9th Cir. 2000)).  Because our conclusion that the district court did not commit "clear error as a matter of law" precludes issuance of the writ, we address only that *Bauman* factor.[6]

"The clear error standard is significantly deferential and is not met unless the reviewing court is left with a 'definite and firm conviction that a mistake has been committed.'" *In re United States*, 791 F.3d at 955 (quoting *Cohen v. U.S. Dist.*

---

[5] Even though *Bauman* was decided before the Supreme Court's most recent discussion of mandamus in *Cheney*, 542 U.S. 367, we continue to apply the *Bauman* factors without separately considering the three conditions described above in *Cheney*. *In re United States*, 791 F.3d 945, 955 n.7 (9th Cir. 2015).

[6] "Clearly erroneous as a matter of law" is a standard that is not familiar to us in any other context.  "Clearly erroneous" is the standard we associate with reviewing findings of fact.  *See* Fed. R. Civ. P. 52(a)(6) ("Findings of fact . . . must not be set aside unless clearly erroneous . . . .").  We assume that by "clear error" in law, we mean something like "plain error," the standard we use to identify when a district court has committed an obvious error of law, but one that was not preserved for appeal by a timely objection.  *See* Fed. R. Crim. P. 52(b); *Puckett v. United States*, 556 U.S. 129, 135 (2009).

16                         IN RE BUNDY

*Court*, 586 F.3d 703, 708 (9th Cir. 2009)). Because, on direct appeal, we "normally review a denial of a motion to appear *pro hac vice* for abuse of discretion," *United States v. Walters*, 309 F.3d 589, 591 (9th Cir. 2002), our review in mandamus proceedings is "especially deferential," *In re United States*, 791 F.3d at 955. On petition for a writ of mandamus, we look to see if the district court abused its discretion in a manner so obvious that the error is "clear" to all.

## III.  ANALYSIS

### A.  *The Standards for Granting* Pro Hac Vice *Status*

A criminal "defendant's [Sixth Amendment] right to the counsel of his choice includes the right to have an out-of-state lawyer admitted *pro hac vice*." *United States v. Walters*, 309 F.3d 589, 591 (9th Cir. 2002) (citation omitted). But because counsel from other jurisdictions "may be significantly more difficult to reach or discipline than local counsel," *United States v. Ries*, 100 F.3d 1469, 1471 (9th Cir. 1996), this right is "circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Importantly, "[t]here is no right of federal origin that permits [out-of-state] lawyers to appear in state courts without meeting that State's bar admission requirements." *Leis v. Flynt*, 439 U.S. 438, 443 (1979) (per curiam).

Federal courts have long had the authority to "establish criteria for admitting lawyers to argue before them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). They have "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession." *Wheat*, 486 U.S. at 160; *see Ries*, 100 F.3d at 1471 (courts

may regulate attorneys appearing before them to "[e]nsur[e] the ethical and orderly administration of justice"); *see also In re United States*, 791 F.3d 945, 957 (9th Cir. 2015) ("[A] court's decision to deny pro hac vice admission must be based on criteria reasonably related to promoting the orderly administration of justice or some other legitimate policy of the courts." (citation omitted)). Where an out-of-state attorney suggests through his behavior that he will not "abide by the court's rules and practices," the district court may reject his *pro hac vice* application. *Ries*, 100 F.3d at 1471.

The Local Rules for the United States District Court for the District of Nevada provide that an attorney who has been retained to appear in a particular case but is not a member of the bar of the district court "may appear only with the court's permission . . . by verified petition on the form furnished by the clerk." Nev. Dist. Ct. Local R. IA 11-2. Among other things, that petition must state

> (4) [t]hat the attorney is not currently suspended or disbarred in any court;
>
> (5) [w]hether the attorney is currently subject to any disciplinary proceedings by an organization with authority to discipline attorneys at law; [and]
>
> (6) [w]hether the attorney has ever received public discipline including, but not limited to, suspension or disbarment, by any organization with authority to discipline attorneys at law.

*Id.* 11-2(b)(4)–(6).   After receiving this information on a verified petition, "[t]he court may grant or deny a petition to practice." *Id.* 11-2(h).

## B.  *Klayman's* Pro Hac Vice *Status*

The district court here did not abuse its discretion—much less commit clear error—when it denied Klayman's *pro hac vice* application.  In its answer to Bundy's petition for a writ, the district court laid out a compelling case for doubting Klayman's ability to abide by local rules of comportment or ethics.  It pointed to three separate categories of activities that made it doubt Klayman's willingness to advance the ethical and orderly administration of justice in Bundy's case:  (1) the pending D.C. disciplinary proceedings involving three separate cases of conflict of interest, including the omissions and misrepresentations he made in the verified petition regarding those proceedings; (2) numerous other cases in which federal district courts have cited him for inappropriate and unethical behavior; and (3) his pattern of perverting the judicial process with insults and intimidation against judges personally.  The district court concluded, based on these three categories, that Klayman's record shows a "total disregard for judicial process" and his admission *pro hac vice* would thus "impede the orderly administration of justice."  We will address the evidence for each of these grounds.

Before we do so, we must address Bundy's argument about the scope of the record.  Bundy points out that a district court "must articulate some reasonable basis for [ethical] doubts before denying the attorney's admissions for pro hac vice admission." *In re United States*, 791 F.3d at 957; *see also Ries*, 100 F.3d at 1472 ("In denying a pro hac vice application, the judge must articulate his reason for the

benefit of the defendant and the reviewing court."). Bundy takes this to mean that any reason not articulated by the district court in its order cannot be considered by a reviewing court. In this case, Bundy argues that we may not consider any reasons or evidence not found in the district court's March 31 or April 19 Orders. However, we have never gone that far, and Bundy fails to point to any case in which we have excluded a district court's justifications that were provided after the fact as, for example, in a response to a mandamus petition.

A rule barring after-acquired evidence or later-supplied rationales might well make sense in the ordinary appeal after trial, where the district court has issued its order denying *pro hac vice* status and is not heard from again on the matter. There, we do not want to allow the opposing party, several months or years down the line, to conjure up reasons that the district court could have given for denying *pro hac vice* status, but failed to actually give—or even know of. But mandamus proceedings in which the district court chooses to submit an answer detailing the district court's concerns about the attorney's ethical transgressions are quite different. We no longer need to speculate as to the district court's possible motivations or lament over whether to give deference to reasons the district court might not have found persuasive in the first instance. Instead, we know exactly why the district court would deny *pro hac vice* status. Moreover, allowing Bundy to force us to limit our review only to the matters Klayman revealed in his petition would give attorneys an incentive to mislead the courts—exactly the type of conduct in which Klayman engaged in this case. Confirming our conclusion that we may consider material supplied after the denial of *pro hac vice* status is the fact that if we thought we were limited to considering only the district court's stated

20                         IN RE BUNDY

reasons, we would vacate and remand to permit the district court to put its additional findings on the record and amend its order.

This has been a fluid and fast-moving proceeding. We conclude that the entirety of the district court's reasoning—both from its orders denying *pro hac vice* status as well as its response to the petition for a writ—should be taken into account.

1. Disciplinary Proceedings Before the D.C. Bar

The district court denied Klayman's request "until such time as Klayman can provide proof that the ethical disciplinary proceeding in the District of Columbia has been resolved in his favor." Klayman concedes that he is still the subject of ongoing disciplinary proceedings by the D.C. Bar, but he strenuously argues that they will be resolved in his favor.

The contested proceedings in the District of Columbia may or may not turn out to be serious. Even if we had the full record before us, that question would not be for us to answer. It is enough for us to know that the proceedings have been going on for several years and are current. A committee held hearings in Klayman's case in January 2016, and Klayman submitted additional briefing to the Bar in March 2016—contemporaneous with his application for *pro hac vice* status in this case.

We do know that the charges—conflicts of interest—are serious enough that in 2015 Klayman was willing to stipulate to "public censure." More recently, on January 13, 2016, a D.C. Bar Hearing Committee rejected the stipulated censure

as "unduly lenient" and, following hearings held that same month, a different Hearing Committee made a preliminary, nonbinding finding that Klayman had violated D.C. Rules 1.9 (conflict of interest) and 8.4(d) (conduct that seriously interferes with the administration of justice) by "clear and convincing evidence." It is this preliminary finding that Klayman has disputed in his March 2016 briefing. Although he contests whether the Bar Counsel has shown by clear and convincing evidence that he has violated the rules of professional responsibility, he has argued to the D.C. Bar that even if there was a "technical violation," the only appropriate sanction should be an "informal admonition."

If the only reason the district court had offered was the bare fact of an open disciplinary proceeding in D.C., the district court might have abused its discretion in denying *pro hac vice* status to Klayman. At a minimum, the district court would have had to make further inquiry—something beyond requiring Klayman to show that the proceedings have been finally resolved in his favor.

But the district court laid out a second, very good reason for its decision: although he had several opportunities to clear the record, Klayman was not forthcoming about the nature and status of those proceedings. In his application, Klayman—properly—disclosed that there was a "disciplinary case pending . . . in the District of Columbia," that the charge was conflict of interest, and that he expected the matter to be "resolved in his favor." The district court denied his petition "for failure to fully disclose disciplinary actions and related documents," and the district court supplied documents filed in the proceeding that showed that Klayman had agreed to "public censure." Even then, the district court only denied the application without prejudice to Klayman refiling. At that

point Klayman was fully on notice that he needed to be transparent about the D.C. Bar proceedings.

Klayman was not forthcoming with the district court. In his "renewed application," Klayman corrected the record—but only in part. He told the district court that the stipulation was of no effect because he had "thought the better of having signed the affidavit and agreeing to negotiated discipline." Klayman may have had second thoughts about stipulating to his "public censure," but his statement was woefully misleading. In fact, a Hearing Committee for the D.C. Bar had rejected that stipulation on behalf of the Bar because it was "unduly lenient." That prompted the hearings in January 2016, a Hearing Committee recommendation, and Klayman's March 2016 brief to the D.C. Bar.

Klayman thus was on notice in the March 31 Order that his initial disclosure of the facts was "misleading and incomplete," yet Klayman offered only a partial correction of the record. As the district court told us, he was not forthcoming about the status of the D.C. proceedings: "Klayman failed to disclose the actual correct disposition of his pending District of Columbia disciplinary case, and instead provided false information to this Court by stating that he withdrew his affidavit when, in fact, the Hearing Committee rejected it." That finding is not clearly erroneous.

Indeed, Klayman had a full and fair opportunity to correct the record when we allowed him to respond to the district court's filing and when we held oral argument. He offered no explanation whatsoever for his failure to disclose the current status of his case. He never advised the district court that the Hearing Committee rejected the stipulation, that there was a recent hearing in January 2016, and that the Hearing

Committee made a recommendation to the D.C. Bar. In fact, we still do not have the most recent documents filed in Klayman's disciplinary case.[7]

These reasons more than justify the district court's decision to deny Klayman *pro hac vice* admission to practice in the district court in Nevada. We have previously held on direct review that it was not an abuse of discretion to deny *pro hac vice* status because of "pending disciplinary proceedings," a "failure to state in his *pro hac vice* application that [the attorney] was subject to pending disciplinary proceedings and . . . his failure to directly address those proceedings when so requested." *United States v. Ensign*, 491 F.3d 1109, 1115 (9th Cir. 2007). When the district court follows our cases, it cannot abuse its discretion.

2.   Sanctionable Conduct in Other Proceedings

Klayman failed to mention, but the district court found quite relevant, "numerous other courts' findings that he is unfit to practice" based on his "inappropriate and unethical behavior." The district court supplied us with a 2007 order of the Supreme Court of New York, which denied Klayman's petition to proceed *pro hac vice* because "Klayman's record demonstrates more than an occasional lapse of judgment, it evinces a total disregard for the judicial process." Order Denying Pro Hac Vice Application at 4, *Stern v. Burkle*,

---

[7] Klayman did submit his March 2016 brief to the district court, and some of these facts may be gleaned from his brief. But to date, we have not seen any recommendation or briefing papers filed by the Hearing Committee following the three days of hearings in January 2016. Submitting the papers from one side in a contested matter is not full disclosure.

24                         IN RE BUNDY

867 N.Y.S.2d 20 (Sup. Ct. 2008).   The New York court
collected examples from other courts, and the district court
referred to these instances of Klayman's sanctioned,
sanctionable, or questionable behavior:

- The Federal Circuit affirmed the district court's
  revocation of Klayman's ability to appear before the
  district court *pro hac vice* in perpetuity and its
  sanctioning of Klayman for accusing the trial judge of
  anti-Asian bias and "unreasonably and vexatiously
  multiplying the proceedings." *Baldwin Hardware Corp.
  v. FrankSu Enter. Corp.*, 78 F.3d 550, 555 (Fed. Cir.
  1996).

- The Second Circuit affirmed the district court's
  revocation of Klayman's ability to appear before the
  district court *pro hac vice* in perpetuity and its
  sanctioning of Klayman for "undignified and discourteous
  conduct that was degrading to the [district court] and
  prejudicial to the administration of justice" by, among
  other things, making accusations of racial and political
  bias and acting "abusive[ly] and obnoxious[ly]."
  *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 994 F. Supp.
  447, 455 (S.D.N.Y. 1997), *aff'd*, 138 F.3d 33 (2d Cir.
  1998).

- Klayman was sanctioned for filing an untimely complaint
  and opposing the government's motion with "frivolous
  filings" that "wasted time and resources of defendants as
  well as of the court." *Wire Rope Importers' Ass'n v.
  United States*, 18 C.I.T. 478, 485 (Ct. Int'l Trade 1994).

- Klayman exhibited "often highly inappropriate behavior"
  and his performance "was episodically blighted by rude

and unprofessional behavior which was directed toward the presiding judge and opposing counsel." *Material Supply Int'l, Inc. v. Sunmatch Indus., Co.*, No. Civ. A. 94-1184, 1997 WL 243223 at *8, *10 n.7 (D.D.C. May 7, 1997), *aff'd in part and reversed in part*, 146 F.3d 983 (D.C. Cir. 1998).

- Klayman "apparently misread (or never read) the local rules" and the district court threatened sanctions for any future failures to comply with local rules. *Alexander v. FBI*, 186 F.R.D. 197, 199 (D.D.C. 1999). The district court "gr[ew] weary of [Klayman's] use—and abuse—of the discovery process" and "ha[d] already sanctioned [Klayman] for making misrepresentations to the court, allowing the court to rely upon those representations in a favorable ruling, and then later contravening those very (mis)representations." *Alexander v. FBI*, 186 F.R.D. 188, 190 (D.D.C. 1999).

- Klayman responded to the district court's orders with a "forked tongue" and made arguments with "malicious glee." *Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice*, 159 F. Supp. 2d 763, 764 (D.D.C. 2001).

- Klayman made arguments regarding the conduct of the district court that were "bizarre" and "beyond the far-fetched." *Dely v. Far E. Shipping Co.*, 238 F. Supp. 2d 1231, 1241 (W.D. Wash. 2003).

Of these eight instances of revocations or denial of *pro hac vice* status, sanctions for ignoring local and federal rules, and complaints of misrepresentations and omissions, Klayman mentioned only two to the district court. And in doing so, the district court noted, Klayman still failed to

26                          IN RE BUNDY

accept any responsibility for his actions. Instead, he claimed that the judges were being "vindictive" in their orders forever barring him from appearing *pro hac vice* in their courtrooms. He failed, however, to mention that these two "vindictive" district court judges' orders were affirmed by their respective federal appellate courts, both of which commented on Klayman's inappropriate behavior. *See MacDraw*, 138 F.3d at 37–38; *Baldwin Hardware*, 78 F.3d at 555.

The district court went on to highlight specifically a more recent case, which Klayman failed to mention, in which the district court's summary judgment order noted how Klayman "has routinely shown a disregard for [the district court's] Local Rules." *Klayman v. City Pages*, No. 5:13-cv-143-Oc-22PRL, 2015 WL 1546173, at *8 n.7 (M.D. Fla. Apr. 3, 2015), *aff'd*, 650 F. App'x 744 (11th Cir. 2016). The Florida district court had "become quite frustrated with [Klayman's] various tactics to avoid Court rules throughout the course of this litigation. Unfortunately, the Court learned early on in this case that this approach to litigation is the norm and not the exception for [Klayman]." *Id.*

Moreover, a quick Westlaw search has found three *additional* cases, bringing the grand total to twelve, in which Klayman's ability to practice law in an ethical and orderly manner was called into question:

• Klayman's "fail[ure] to comply with even the most basic of discovery requirements" was "not simply an unexplained hiccup in an otherwise diligently prosecuted case" and thus warranted sanctions. *Klayman v. Barmack*, No. 08-1005 (JDB), 2009 WL 4722803, at *1 (D.D.C. Dec. 4, 2009).

- After "the patent failure of the Court's use of lesser sanctions in the past to have any discernible effect on Klayman' conduct," Klayman's "consistent pattern of engaging in dilatory tactics, his disobedience of Court-ordered deadlines, and his disregard for the Federal Rules of Civil Procedure and the Local Rules of this Court" necessitated further, more severe, sanctions. *Klayman v. Judicial Watch, Inc.*, 802 F. Supp. 2d 137, 138–39 (D.D.C. 2011).

- Klayman repeatedly did not "attempt to comply" with local rules, and the district court threatened sanctions for any further violations. *Montgomery v. Risen*, No. 15-cv-02035-AJB-JLB, 2015 WL 12672703, at *1 (S.D. Cal. Oct. 2, 2015).

Klayman has a reputation as a vigorous litigator, but this is not a flattering record, and not one that the district court should ignore. When a district court admits an attorney *pro hac vice*, the attorney is expected to follow local rules. *See In re United States*, 791 F.3d at 957 n.8 ("A district court would clearly act within its discretion in denying *pro hac vice* admission if, for example, an attorney's actions led the court to conclude the attorney would not 'abide by the court's rules and practices' . . . ." (quoting *Ries*, 100 F.3d at 1471)). Klayman has shown an unwillingness or inability to do that. The dilemma for a district court presented with such a record is that, once an out-of-state attorney is admitted, the district court has limited tools in its arsenal for maintaining order in the courtroom. Repeated and willful violations of court rules must be dealt with by the district court alone. The district court can refer the attorney to a bar, but has no means to follow up its referral. Instead, the district court is limited to its own powers. Those powers are not insubstantial, *see, e.g.,*

28                              IN RE BUNDY

18 U.S.C. § 401; 28 U.S.C. § 1927; *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991) (discussing the inherent powers of the courts), but the exercise of those powers can be disruptive to trial proceedings and, in an extreme case, may call into question the fairness of the trial itself.

We fully acknowledge that "attorney[s] may with impunity take full advantage of the range of conduct that our adversary system allows"—they have "a right to be persistent, vociferous, contentious, and imposing, even to the point of appearing obnoxious when acting in their client's behalf." *In re Dellinger*, 461 F.2d 389, 400 (7th Cir. 1972). However, the district courts must carefully balance that vigorous advocacy against the need for order and decorum in the proceedings. *See In re McConnell*, 370 U.S. 230, 236 (1962). Wherever that line lies, Klayman has crossed it more than once, and the district court did not abuse its discretion—and certainly did not come close to committing clear error—in taking account of Klayman's past behavior and denying him *pro hac vice* status.

### 3.    Attempts to Intimidate the District Court

Finally, the district court expressed concern that Klayman has shown disregard for district judges in the past by confronting them personally. The district court pointed to the Second Circuit's finding that Klayman had challenged U.S. District Judge Denny Chin's impartiality because he was Asian-American[8] and had been appointed by President

---

[8] The Second Circuit noted that in proceedings in the Central District of California, "[d]isturbingly, Klayman . . . accused the district judge of being anti-Asian." *MacDraw*, 138 F.3d at 38 n.3 (citing *Baldwin Hardware*, 78 F.3d at 555, 562).

Clinton. The court found the challenge to the judge's racial and ethnic heritage "extremely serious." *MacDraw*, 138 F.3d at 37. "Nor should one charge that a judge is not impartial," the court emphasized, "solely because an attorney is embroiled in a controversy with the administration that appointed the judge." *Id.* at 38. The Second Circuit found that these charges were "discourteous" and "degrading" to the court, "prejudicial to the administration of justice," and "insulting and smacked of intimidation." *Id.* at 37–38. The court "[did] not hesitate to hold that the suggestions regarding Judge Chin's impartiality violated the Code of Professional Responsibility." *Id.* at 38.

These lessons have not been learned. After the district court denied Klayman's *pro hac vice* petition, but before Bundy asked this court for mandamus relief, Bundy filed a *Bivens* suit against Chief Judge Gloria Navarro, President Barack Obama, U.S. Senator Harry Reid, and others, in their personal capacities, alleging a conspiracy to violate his civil rights. *See Bundy v. Obama*, No. 2:16-cv-1047-JCM-GWF (D. Nev. dismissed with prejudice Oct. 12, 2016).[9] He dismissed the suit on October 12, 2016, only after we asked for briefing in this mandamus petition. Reasonably, the district court found these two cases "similar[]." As in the case involving Judge Chin, Klayman's participation in the suit against Chief Judge Navarro personally "smack[s] of intimidation" and retaliation.

---

[9] The suit was filed by attorney Hansen. It does not list Klayman as counsel. In response to questions at oral argument about the suit, Klayman displayed knowledge of the content of the lawsuit and at first admitted to being a plaintiff before clarifying that he wasn't. It is apparent that Klayman played some role in the preparation and filing of that suit.

30                          IN RE BUNDY

C. *The Dissent's Reasons for Granting the Writ of Mandamus*

The dissent offers two reasons for why Bundy's request for Klayman to be admitted *pro hac vice* outweigh the district court's concerns: (1) "the complexity of the proceeding against [Bundy] and his controversial political views raise concerns about his ability to retain competent counsel," Dissenting Op. at 40, and (2) "denying Klayman admission raises troubling concerns about the fairness of Bundy's coming trial," *id.* at 42. We do not think that either of these reasons withstands scrutiny.

First, there is nothing in the record about Bundy's efforts to secure competent counsel. The dissent declares that "only a fraction of the bar nationwide—*let alone in Nevada*—has the experience and resources necessary to give Bundy a vigorous defense." *Id.* at 40–41 (emphasis added). Additionally, the dissent claims that "[o]ut of that fraction of qualified practitioners, there is likely an even smaller proportion that would actually accept Bundy's representation. Bundy's anti-government views and high-profile status among those who oppose federal hegemony make the prospect of representing him daunting for many seasoned defense attorneys." *Id.* at 41.[10]

---

[10] The dissent also focuses on the fact that the trial is scheduled for February, "a little over three months from now." Dissenting Op. at 38. That is not the district court's fault. Klayman filed his *pro hac vice* application in March; the district court denied it without prejudice nine days later. He filed a renewed application in April; the district court denied it without prejudice twelve days later. Bundy then waited three months before filing his petition for a writ of mandamus. Our Clerk's Office, after discussions with Bundy's counsel, held the petition until September and presented it to us in October. The six-month delay in

Nothing in the record remotely supports these statements. For example, we do not have an affidavit from anyone— Bundy, Klayman, Hansen, or anyone else—telling us of unsuccessful efforts to find counsel. The dissent can only state that since the district court's denial in March 2016, "Bundy *seems* to have failed at finding suitable replacement trial counsel." *Id.* at 41 (emphasis added). That is not evidence. And if even there were *some* evidence to suggest this, the district court could not have anticipated the problem. There is no clear error in the district court's orders.

Second, the dissent has questioned the fairness of the trial before it even begins: but for Klayman's "capable representation, there will be serious doubts about the fairness of the proceeding." *Id.* at 43. Again, with all due respect, there is nothing in the record but the dissent's speculation about "this risk of fundamental unfairness" in a forthcoming trial. *Id.* at 43. There is no abuse of discretion or clear error in the district court's order.

The dissent acknowledges that Klayman might have "been selective in his disclosures" to the district court and there might have been a "relevant omission" resulting in Klayman "com[ing] near the line." *Id.* at 43, 44–45. For the reasons we have described in some detail, *supra* at 20–29, Klayman engaged in selective disclosures, made relevant omissions, and crossed the line, but if even the dissent thinks

---

seeking extraordinary relief from the district court's March and April Orders must be laid at the feet of Bundy and this court, not the district court.

If Bundy thinks he cannot be prepared for his February 2017 trial, he may ask the court to delay the trial. *See* 18 U.S.C. § 3161(h)(8)(B)(iv).

32                              IN RE BUNDY

Klayman came "near the line," that is not clear error justifying a writ of mandamus.

Finally, the dissent dismisses the rulings by Judges Keller and Chin because they were "issued 22 and 18 years ago" and may be "poor predictors of Klayman's likely behavior today." Dissenting Op. at 45. If Klayman had acted responsibly in the time since then, we might be inclined to agree with the dissent that conduct twenty-years in the past is outdated. But, as the district court properly advised us in her filing, Klayman has not changed. Judges have sanctioned, chastised, and rebuked Klayman repeatedly over the past twenty years: in 1997, 1999, 2001, 2003, 2009, 2011, and *twice* in 2015. As the Middle District of Florida observed last year: "[T]his approach to litigation is the norm and not the exception for [Klayman]." *City Pages*, 2015 WL 1546173, at *8 n.7. The Eleventh Circuit affirmed that judgment in 2016. 650 F. App'x 744.

## IV.  CONCLUSION

Klayman has made misrepresentations and omissions to the district court regarding the ethics proceedings before the District of Columbia Bar; he has shown a pattern of disregard for local rules, ethics, and decorum; and he has demonstrated a lack of respect for the judicial process by suing the district judge personally. By any standard, the district court properly denied his petition to be admitted *pro hac vice*. Bundy is entitled to a fair trial, defended by competent, vigorous counsel of his choosing. But his right to such counsel does not extend to counsel from outside the district who has made

it a pattern or practice of impeding the ethical and orderly administration of justice.

The writ of mandamus is **DENIED.**

---

GOULD, Circuit Judge, dissenting:

We confront in this case an unusual confluence of circumstances. A highly controversial criminal defendant is a few months away from an enormous trial effort in which he and eighteen other individuals are defendants. The defendant's chosen attorney has been denied admission pro hac vice to the district court, raising in my mind serious concerns about the defendant's ability to mount a vigorous defense and receive a fair trial. Despite the majority's expressed apprehensions about the chosen attorney's willingness to follow the rules of professional conduct and the orders of the district court, while recognizing the high standards for mandamus relief, I would hold that the writ should issue. My concerns about the defendant's ability to present a strong defense and receive a fundamentally fair trial are simply too great, leading to my dissent.

**I**

On March 2, 2016, Cliven D. Bundy and eighteen others were indicted on various federal charges for their alleged involvement in a "massive armed assault" on federal officials near Bunkerville, Nevada nearly two years prior. The now-unsealed Superseding Indictment alleges that on April 12, 2014, Bundy led "hundreds of people, including gunmen

34                         IN RE BUNDY

armed with assault rifles" in a coordinated assault against the government officials.

The events that day grew out of a dispute between Bundy and the federal Bureau of Land Management. According to the Superseding Indictment, for over 20 years Bundy, a rancher, had refused to obtain permits or pay the required fees for his cattle to graze on federal public lands. As a result, since 1998 Bundy had been under a federal court order to remove his trespassing cattle. He never complied with the order, and in 2013 federal officials received authorization to seize and remove Bundy's cattle from the land. They began the process of seizure and removal on April 5, 2014.

While the removal process was ongoing, it is alleged that Bundy and his co-defendants used the internet and other means of interstate communication to recruit gunmen and "Followers" to travel to Nevada to help Bundy make a show of force against the federal government. The defendants' online communications allegedly included requests for help from members of anti-government militia groups. The content of the communications referred to the federal government as corrupt and to government officials as thieves. Bundy was portrayed as a victim of government abuse whose sovereign rights had been violated. Other statements alleged in the Superseding Indictment show that Bundy viewed himself as involved in a "range war" with federal officials.

By the morning of April 12, 2014, more than 400 people had allegedly shown up to help Bundy, many of them allegedly armed with assault rifles or other weapons. Approaching from two different vantage points, Bundy and these Followers allegedly used firearms to threaten federal officers into giving up Bundy's cattle. The Government also

claims that after getting his cattle back, Bundy organized his Followers into armed security patrols and checkpoints for the purpose of protecting his cattle against future government seizures.

## II

A writ of mandamus is an extraordinary writ used "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Will v. United States*, 389 U.S. 90, 95 (1967) (internal quotation marks omitted). We have jurisdiction to grant such writs under 28 U.S.C. § 1651.

For a writ of mandamus to issue, the party seeking the writ must satisfy three requirements. First, the petitioner must have no other means of attaining the desired relief. *In re United States*, 791 F.3d 945, 954 (9th Cir. 2015). Second, the right to issuance of the writ must be "clear and indisputable." *Id.* (quotations omitted). Third, even if the first two prerequisites are met, we must be satisfied in the exercise of our discretion that the writ is appropriate under the circumstances. *Id.* at 955. In assessing whether the writ is appropriate, we examine five factors: (1) whether the party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires; (2) whether the petitioner will be damaged or prejudiced in a way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems, or issues of law of first impression. *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654–55 (9th Cir. 1977). These factors should be viewed

36                          IN RE BUNDY

as guidelines, not requirements, and should be weighed together, as appropriate to the facts of the case. *DeGeorge v. U.S. Dist. Court.*, 219 F.3d 930, 934 (9th Cir. 2000). Typically, the absence of the third factor, clear error as a matter of law, will defeat the petition. *Id.*

In my view, both the first and second *Bauman* factors weigh solidly in favor of granting relief. We have previously recognized that parties denied pro hac vice admission are unable to obtain immediate relief through an appeal because the denial of admission is neither a final appealable order under 28 U.S.C. § 1291 nor an interlocutory order appealable under 28 U.S.C. § 1292. *See In re United States*, 791 F.3d at 958. Losing counsel of choice through a denial of pro hac vice admission also produces a harm that is not correctable on a later direct appeal. *Id.* at 959. I view the fourth *Bauman* factor as weighing against granting the writ. As I discuss below, this case is unusual in that Bundy faces an imminent, massive and complex trial, as well as difficulties in retaining qualified counsel. These circumstances make any error by the district court of a type not likely to be repeated often. And I view the fifth factor as weighing slightly in favor of granting relief. The central issue in this case—whether denying Klayman's admission significantly impairs Bundy's ability to present a strong defense—is vastly important, but is only an issue of first impression in the sense that the circumstances Bundy finds himself in are relatively atypical. I more fully discuss these circumstances below.

The outcome of this case turns not on the first, second, fourth, or fifth *Bauman* factors, but on the third: whether the district court clearly erred in denying Klayman's pro hac vice application. In assessing this factor, I maintain a keen awareness of the deference we give to the district court. We

grant mandamus petitions only sparingly, as writs of mandamus are an "extraordinary or drastic remedy." *Calderon v. U.S. Dist. Court for Cent. Dist. of California*, 163 F.3d 530, 534 (9th Cir. 1998) (en banc) (internal quotation marks omitted), *abrogated on other grounds by Woodford v. Garceau*, 538 U.S. 202 (2003). The task of looking for clear error is a manifestation of this deference: "clear error" requires a more significant mistake than "mere error." In addition, a district court's decision to accept or deny a pro hac vice application is itself reviewed only for abuse of discretion. *United States v. Walters*, 309 F.3d 589, 591 (9th Cir. 2002). We do not find an abuse of discretion unless the district court committed legal error, or made a factual determination that was illogical, implausible, or without support in inferences that may be drawn from the record. *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

We face then a dose of double deference: we review the district court order under the abuse of discretion standard; and we grant mandamus relief in only exceptional circumstances, looking for evidence of clear error. *See In re United States*, 791 F.3d at 955. There are also pragmatic reasons for deferring to a district court decision denying pro hac vice admission. After all, it is the district court judge, not an appellate panel, that is on the front lines in the courtroom, dealing closely with lawyers and having to do so in a way that ensures the orderly administration of justice.

Yet, even in this highly deferential setting, there are limits on trial court discretion, and there are times when we should act.

38                              IN RE BUNDY

## III

An overriding consideration, in my view, is that a little over three months from now, Bundy is scheduled to go to trial on sixteen serious federal charges, and may do so without a lawyer of his choice; either without representation at all, or with a different lawyer, not of Bundy's first choice, who comes into the case so late that there should be concern that the quality of representation may be substantially impaired. The charges against Bundy include conspiracy to commit an offense against the United States, 18 U.S.C. § 371, conspiracy to impede and injure a federal officer, *id.* § 372, assault on a federal officer, *id.* § 111 (a)(1) and (b), threatening a federal law enforcement officer, *id.* § 115(a)(1)(B), use and carry of a firearm in relation to a crime of violence, *id.* § 924(c), obstruction of the due administration of justice, *id.* § 1503, interference with interstate commerce by extortion, *id.* § 1951, and interstate travel in aid of extortion, *id.* § 1952. If convicted on some or all of the charges, Bundy, who is 70 years old, could spend the rest of his life in prison.

The trial promises to be especially long and complex. The Superseding Indictment alleges that Bundy led "hundreds of people" in "a massive armed assault."[1] Along with Bundy, the government seeks to prosecute 18 other individuals involved in that alleged assault, all in one proceeding. This enormous trial effort is the product of a longer-than-two-year investigation that involved government interviews with more

---

[1] While I mention the subject matter of the allegations against Bundy because they are relevant to his ability to retain capable counsel, I express no view on the merits of the underlying case. The merits of the criminal charges are not before us, and I have not reviewed any evidence relating to them.

than 150 witnesses. The Government ultimately expects to produce about 1.4 terabytes of digital discovery to the defendants. The litigation is sufficiently complicated that the district court designated the proceeding a complex case under the Speedy Trial Act. *See* 18 U.S.C. § 3161(h)(7)(B)(ii).

In addition to its size and complexity, the trial effort against Bundy and his cohorts is unusual in that Bundy's political views, hostile to the United States federal government, will likely be center-stage. The allegations in the indictment portray Bundy as being strongly opposed to the federal government and as considering himself involved in a "range war" with federal officials. The Government alleges that Bundy and his Followers communicated with members of anti-government militias, recruiting them to Bundy's cause. Bundy also allegedly made statements referring to the government's seizure as "abuse," and to government agents as "thieves," among other similar refrains. While Bundy's trial and any potential conviction will not, and must not, be based on politics, it is likely that the evidence at trial will put his controversial political views in the courtroom with him.

The unique circumstances surrounding Bundy's prosecution bring with them a likelihood of constitutional problems. Like any defendant, Bundy's Sixth Amendment "right to the counsel of his choice includes the right to have an out-of-state lawyer admitted *pro hac vice*." *Walters*, 309 F.3d at 592 (quotations omitted). While that right is not absolute, it may only be abridged to serve a "compelling purpose." *Id.* (quotations omitted). We have not specified the factors that a district court must consider in determining what satisfies a compelling purpose for pro hac vice denial. *In re United States*, 791 F.3d at 957. However, case law on

pro hac vice admission indicates that we should evaluate the district court's exercise of discretion in part based on the particular needs of the party seeking representation.

*In re United States* is instructive. There, we held that a district court's general rule prohibiting the pro hac vice admission of Justice Department attorneys amounted to clear error. *Id.* at 958. In reaching that conclusion, we emphasized the special needs of the party before the court—the United States. *See id.* ("[A] district court should consider the unique position of the government as a litigant in determining whether to exercise its discretion." (internal quotation marks omitted)).[2] In *United States v. Ensign*, a case in which we ultimately affirmed the district court's pro hac vice denial, we likewise based our decision in part on the particular needs of the party—a criminal defendant who was already well into trial with different counsel at the time of the pro hac vice application. 491 F.3d 1109, 1115 (9th Cir. 2007). That we would give considerable weight to the needs of the party makes sense: whether a purpose for denying pro hac vice admission is "compelling" depends both on the importance of the purpose and the effect of the denial.

Looking to Bundy's needs and circumstances, both the complexity of the proceeding against him and his controversial political views raise concerns about his ability to retain competent counsel in a timely fashion. With so many defendants, documents, and potential witnesses in the case, only a fraction of the bar nationwide—let alone in

---

[2] Though the United States was not a criminal defendant in *In re United States*, and so the Sixth Amendment did not apply, the case still supports considering the needs of the party when deciding on pro hac vice admission generally.

Nevada—has the experience and resources necessary to give Bundy a vigorous defense. Out of that fraction of qualified practitioners, there is likely an even smaller proportion that would accept Bundy's representation. Bundy's anti-government views and high-profile status among those who oppose federal hegemony make the prospect of representing him daunting for many seasoned defense attorneys. It is unsurprising, then, that not only has Bundy sought out-of-state counsel, but that he has found himself retaining an attorney with a controversial reputation of his own. It may be the case here that a controversial advocate is the best chance at a competent defense for a controversial defendant.

This point is made stark by the fact that since Klayman's initial pro hac vice denial on March 31, 2016, Bundy seems to have failed to find suitable replacement trial counsel. This is so despite Bundy's impending trial date and Klayman's second pro hac vice denial. Instead, Bundy is currently represented before the district court by his local counsel, Nevada attorney Joel Hansen, who is by Hansen's own admission unable to provide Bundy with an adequate defense. Hansen is part of a small Nevada firm lacking the resources to try this massive case. Moreover, Hansen has attempted to withdraw from Bundy's defense on the ground that he suffers from a spine and neck injury. According to the Government's representations at oral argument before us, Hansen's motion has been granted on the condition that Hansen find replacement counsel. Shortly prior to argument, Nevada attorney Bret O. Whipple filed a notice of appearance on Bundy's behalf, but only for the limited purpose of filing certain pretrial motions. Government counsel stated at argument that Whipple was currently in negotiations with Bundy over his representation. After our oral argument on the mandamus petition, the Government advised us that

42                              IN RE BUNDY

Whipple entered another appearance on behalf of Bundy, this time "for the purpose of full representation throughout the duration of the trial." But Klayman responded that despite this new language from Whipple, Bundy is still considering whether to hire Whipple and has not paid Whipple any retainer, and that regardless of the additional appearance of Whipple, Klayman's assistance is still needed by Bundy on the defense team. At this point, I am not confident that Bundy presently has retained counsel adequate to represent him vigorously through trial.

Klayman appears ready and qualified to represent Bundy at trial. He is a former federal prosecutor with experience litigating high-profile cases. He has worked, in part during his time at Judicial Watch, in bringing lawsuits over significant public policies. *See, e.g., Klayman v. Obama*, 957 F. Supp. 2d 1 (D.D.C. 2013) (challenge to government telephone metadata collection), *vacated and remanded*, 800 F.3d 559 (D.C. Cir. 2015). He has almost 40 years of legal experience and is a member in good standing of both the Florida and Washington, D.C. Bars. Though not currently admitted before the district court, Klayman has been in contact with Bundy about this case since around the time of Bundy's indictment. Klayman presumably faces a much shorter learning curve than other potential counsel, including, for example, Whipple.

Given Klayman's present familiarity with this case and the difficulties Bundy likely faces in retaining other capable counsel, denying Klayman admission raises troubling concerns about the fairness of Bundy's coming trial. The right to counsel clause of the Sixth Amendment "was designed to assure fairness in the adversary criminal process." *Wheat v. United States*, 486 U.S. 153, 158 (1988). In the

IN RE BUNDY                                            43

typical choice of counsel case, concerns about fairness are present, but they do not predominate, because missing out on the defendant's preferred lawyer does not mean missing out on qualified counsel altogether; the normal assumption is that the defendant will be able to retain some other qualified attorney. *See id.* at 159. But because of Bundy's practical and predictable problems finding capable representation in the time remaining before trial, the denial of his chosen counsel risks leaving him without fully qualified counsel. The powerful concerns about fundamental fairness that animated landmark right-to-counsel (not merely choice-of-counsel) cases like *Powell v. Alabama*, 287 U.S. 45 (1932), and *Gideon v. Wainwright*, 372 U.S. 335 (1963), carry particular weight here. If Klayman's denial of admission results in Bundy going to trial without capable representation, there will be doubts about the fairness of the proceeding. This risk of fundamental unfairness supports concluding that the district court acted outside the range of its permissible discretion.

I recognize that the ethical concerns of the majority and the district court, particularly their concern whether Klayman has been candid and forthcoming in his representations seeking pro hac vice admission, have some weight. Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate. But then, after the district court discovered his Petition for Negotiated Disposition, he may have come near the line of lack of candor in explaining it away. He stated that the disposition never went into effect because he "later thought the better of having signed the affidavit . . . since he feels strongly that he acted ethically at all times." Yet, what had happened was a D.C. Board on Professional

44                              IN RE BUNDY

Responsibility Hearing Committee had rejected the disposition as too lenient for the bar's tastes.[3]

At oral argument before us, Klayman explained his view of the difference by saying that after the rejection, he at first continued to negotiate with counsel for the D.C. Bar, but then decided to withdraw from those negotiations. While this shows that Klayman was not lying in his initial explanation, he still seems to have been, at the least, selective in his disclosures to the district court. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests. Yet, for him to tell the district court that it was wrong about the negotiated discipline

---

[3] This bar committee rejection for undue leniency does not indicate how the merits of the proceeding will come out. The decision rejecting the negotiated disposition said that it did not consider certain "potential mitigation" factors that would be considered in determining whether any ultimate violation was "justified." These potential mitigation factors included that Klayman might not have actually had a conflict in two of the three representations, that he represented two of the individuals because he believed that "they would have no other recourse in their lawsuits," and that the representations were all performed *pro bono*. Moreover, a statement of a bar committee in this context is not, in my view, of controlling weight because it is not a final determination of ethical violations. Instead, the committee's views remain subject to other information it could consider, and the whole matter remains subject to review by the federal Court of Appeals for the D.C. Circuit if a final resolution by the bar association was reached that Klayman appealed.

being in effect and to not also tell the court why the disposition lacked effect—its rejection by the bar committee—may have been a relevant omission.

The other concerns raised by the district court in its briefing in this court and its two orders denying Klayman admission, in my view, carry less weight. First, the allegations underlying the D.C. proceeding are unproven, and we cannot know what their resolution will be. The district court held this uncertainty against Klayman, stating in its two orders denying his admission that Klayman would need to show that the proceeding was resolved in his favor before the court would admit him. This approach is contrary to the our legal tradition's instinct to presume innocence until finding guilt. Of course, the D.C. proceeding involves attorney discipline and not criminal prosecution, but fundamental principles still have weight—at least in terms of evaluating the district court's exercise of discretion. At this time, Klayman is still a member of the D.C. Bar, and has not been disciplined by its Board on Professional Responsibility. Moreover, Klayman has submitted a letter from Professor Ronald Rotunda, an expert on legal ethics, expressing the opinion that Klayman's actions at issue were ethical. This is all the more reason not uncritically to credit unproven bar allegations.

The district court and the majority also point to the two instances of federal judges banning Klayman from their courtrooms. While serious punishments, these orders were issued 22 and 18 years ago. Two decades—half of Klayman's career—is enough time for the incidents to be relatively poor predictors of Klayman's likely behavior today. The district court, as well as the New York state court that denied Klayman pro hac vice admission, noted that other

46                                IN RE BUNDY

judges, even recently, have in their written orders expressed irritation or disapproval of Klayman's actions. It may be that Klayman is not an attorney whom all district court judges would favor making an appearance in their courtroom. It seems he has been, and may continue to be, a thorn in the side. Still, concerns about trial judge irritation pale in comparison to a criminal defendant's need for robust defense. In providing a full and fair defense to every criminal defendant, there will by necessity be occasions when the difficult nature of the case evokes sharply confrontational lawyering. In tough cases with skilled prosecutors, aggressive positions by defense lawyers are sometimes an unavoidable part of strong advocacy, and contribute to making the proceeding an ultimately fair one for the defendant.

I do not dismiss lightly the district court's ethical concerns regarding Klayman, especially the issue of candor. The district court had good grounds to be worried about Klayman appearing before it. But the need to provide a vigorous defense for Bundy is a superordinate concern. Bundy faces a very complex trial on serious criminal charges and a potential lack of qualified representation. If convicted, he may spend the rest of his life in prison. We cannot evaluate ethical concerns without considering this context. The district court did not fully consider this bigger picture, and did not ensure that Bundy's need for a vigorous defense was given due weight. In my view, these circumstances should be controlling in our assessment of whether the district court's decision to deny Klayman pro hac vice admission was an abuse of discretion and clear error.

I also do not suggest that district courts generally must blink over ethical concerns. At least two other circuits have

held that the only thing a district court may consider in pro hac vice admission is whether the out-of-state attorney is guilty of conduct so unethical as to justify disbarment. *See In re Evans*, 524 F.2d 1004, 1007 (5th Cir. 1975); *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997). Our circuit, by contrast, permits denial of pro hac vice admission based on a broader standard—one that grants district courts leeway to consider the facts pertinent to the particular case. *See In re United States*, 791 F.3d at 956 ("We need not announce specific factors that should inform a district court's exercise of its discretion to deny pro hac vice admission."). In holding the view that the district court abused its discretion and clearly erred here, I need not suggest that our circuit's law should be disregarded and should conform with that of the Fifth and Eleventh Circuits. I can agree with the principle reaffirmed in *In re United States* that in appropriate cases, ethical concerns not meriting disbarment may be sufficient to justify pro hac vice denial. 791 F.3d at 956. But the matter before us is not such an appropriate case. Concerns about Bundy receiving a proper defense to ensure a fair criminal trial in my view should be considered controlling by our panel.

I also emphasize that district courts have available to them many tools short of denying admission that allow them to keep unruly lawyers in check. Through the power of sanctions, and in extreme cases even contempt proceedings, district courts can expect to be able to control a lawyer who is considered by the court to be recalcitrant, tricky, or deceptive, subject to the normal legal standards governing sanctions. At oral argument, Klayman advised us that he would follow all orders issued by the district court regarding the orderly administration of justice, and that he would abide by any other orders of the district court. I accept his

48                              IN RE BUNDY

representation and expect that if he were admitted and then deviated from it, the district court would be well-equipped through its sanction power to take corrective action.[4]

I acknowledge that we grant mandamus relief sparingly, particularly in cases challenging the denial of pro hac vice admission. Yet given the number of serious charges Bundy faces, the complexity of his trial, his likely difficulty in finding other qualified counsel, and Klayman's own qualifications, I conclude that the district court's concerns over Klayman's practice history and candor are outweighed by Bundy's need for adequate representation in this important and complex case. Based on the unusual facts of this case and the considerations that I have voiced, I would hold that the district court abused its discretion, resulting in clear error. If, as the majority holds, our circuit's law on abuse of discretion and clear error for mandamus relief requires its conclusion to deny the mandamus petition, then in my view that law stands as a barrier to justice and should be altered. In an unusual case such as this, involving a massive federal prosecution of many persons and allegations that their sentiments and alleged criminal conduct were sharply opposed to our federal government, it is particularly important to ensure that target defendants are able to be represented and defended vigorously. There is doubtless some merit to the bright-line views of the Fifth and Eleventh Circuits that a counsel of choice should not be eliminated through the pro hac vice admission process absent an ethical violation that could merit disbarment. But even accepting our

---

[4] The Government made clear at oral argument that it does not challenge Klayman's representation, does not urge that Klayman not be admitted, and generally suggests that Bundy is entitled to a vigorous defense.

circuit's broader view that ethical problems short of those may be pertinent to a district court's decision on whether a lawyer should be admitted pro hac vice, there are nonetheless limits on a district court's exercise of discretion, and I think they are transgressed here.

To give a metaphorical example, we would not need a finely-tuned judicial scale to determine that a district court abused its discretion if it found that a mouse outweighed an elephant. That would be an abuse of discretion, and clear error. And here, even if the purported ethical flaws marshaled by the majority and the district court are beyond "mouse" proportions, they are still relatively small in this special context, where the elephant is Bundy's general entitlement to the counsel of his choice and to a vigorous defense at trial. In my view, concerns about whether at this stage Bundy will have adequate and vigorous representation, absent Klayman, outweigh the ethical concerns that have been expressed by the district court and the majority.

I respectfully dissent.

## FEDERAL COURT PROOF OF SERVICE

Larry Klayman v. Todd Lanman, M.D.
Case No. 2:26-cv-04525-AB (PDx) / File No. 43090-56

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to the action. My business address is 633 West 5th Street, Suite 4000, Los Angeles, CA 90071.  I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On May 26, 2026, I served the following document(s):  **DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND TO STAY THE DISTRICT COURT MATTER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF  JEFFREY S. HEALEY, ESQ.; DECLARATION OF BLAIR SIEGEL; EXHIBITS**

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

Larry Klayman, In Pro Se
7050 W. Palmetto Park Road
Boca Raton, FL 33433
Telephone: (310) 595-0800
E-Mail: leklayman@gmail.com

The documents were served by the following means:

☒    (BY COURT'S CM/ECF SYSTEM)  Pursuant to Local Rule, I electronically filed the documents with the Clerk of the Court using the CM/ECF system, which sent notification of that filing to the persons listed above.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on May 26, 2026, at Los Angeles, California.

_____
Leticia Rodriguez

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

177182245.1

22

DECLARATION OF  BLAIR SIEGEL